KAZUTO IKEDA *v.*

OKADA TRUCKING COMPANY, LIMITED.

No. 4253.

June 15, 1964.

Tsukiyama, C.J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

OPINION OF THE COURT BY MIZUHA, J.

Plaintiff, Kazuto Ikeda, while employed as a carpenter's apprentice by the United Construction Company, was injured by a concrete bucket which fell off a crane which was rented for a concrete pouring job during the construction of a men's dormitory building on the campus of the University of Hawaii.

In the early morning of the day of the accident, United

Construction Company's foreman, Hiroji Maeda, rented a crane from defendant, Okada Trucking Company, to complete the pouring of concrete for the building. The crane was rented with an operator on an hourly basis. In addition to the hourly rental charge, there was a charge for either half an hour or an hour prior to the concrete pouring operation, depending upon the time it took to prepare the crane.[1] The rental agreement was made with Samuel Kekaha, the crane operator, an employee of Okada Trucking Company; and, Kekaha's authority to contract for the rental of the crane is not denied by defendant.

At the time the rental agreement was made, the crane was elsewhere on the University of Hawaii campus.[2]

[1] "Q   Now what was the basis of the rental, Mr. Maeda, was it by the day, by the month or what?

"A   For that crane rental, it was by the hour.

"Q   Now when did this hourly rental for the crane commence, when did it first start, with the commencement of the pouring of concrete?

"A   But, ordinarily, they charge either half an hour or one hour prior to the concrete because it depends on the preparation of the crane, too, see.

"Q   All right, let me ask you this question. While the crane is operating, pouring concrete and doing what you tell it to do on the job, there is an hourly rental for the crane, is there not?

"A   That's right.

"Q   Now in addition to this hourly rental, was there any other charge on this date for the use of this crane?

"A   Well, if you mean the preparation of the —

"Q   What do you mean by 'preparation'?

"A   To prepare it for the concrete pour.

"Q   When did the pouring of the concrete on this job begin on October 17th, 1956?

"A   Well, I'm not sure about the time but I know it was the time —

"Q   To the best of your recollection, Mr. Maeda.

"A   I'm pretty sure it was in the afternoon.

"Q   What time in the afternoon?

"A   I guess it would be about 1:30 or 2 o'clock.

"Q   Then, Mr. Maeda, when did the rental for this crane, for the preparation, commence with respect to the 1:30 or 2 o'clock?

"A   I'd say a half an hour prior to this.

"Q   Now, Mr. Maeda, suppose that this crane was hooked up earlier in the morning, say, at 7 or 8 o'clock on October 17th, 1956, would the hourly rental start at that time?

"A   No."

[2] The evidence is not clear as to the location of the crane on the morning of the day of the accident, but it was somewhere on the campus where Okada had a contract to do dirt-moving and excavation work.

Samuel Kekaha testified that sometime between 7:00 and 8:00 in the morning, after agreement to rent the crane had been reached, he attached a hook to the crane. Apparently, this was normal procedure on his part whenever the crane was to be used in concrete hoisting and pouring operations. He further testified that he had used hooks of this nature on concrete pouring jobs in the past, "moused" with wire as shown in a photograph, Exhibit 2 in evidence.[3]

At the time of the accident the crane was rigged in the following manner: The cable entered the socket on the right hand side and went down through the socket and came up and out on the left hand side of the socket. To secure the cable in the socket, a socket wedge was tightly inserted between the cable strands. Attached below the socket was a shackle or clevis. The hook was attached to the shackle or clevis. A concrete bucket, approximately 400 pounds at the time of the accident, the property of plaintiff's employer, United Construction Company, hung from the hook.

---

[3] "Q  When was that hook placed on the rigging?
"A  Prior to the pouring of the concrete.
"Q  How much prior?
"A  That morning.
"Q  Have you ever used a hook of this nature on pour jobs before?
"A  Yes, I have.
"Q  Moused in the manner that you see here? [Exhibit 2]
"A  Yes.
"Q  And the purpose of that mousing is what?
"A  Well, it's more or less a practice to try to eliminate the hook from coming off.
"Q  So it is your purpose of putting mousing on the hook to keep the bucket from coming off the hook?
"A  Yes.
"Q  This, without effective mousing, is called an open hook, is it not?
"A  Yes.
"Q  And if the mousing is effective or if there is a safety appliance across the throat that keeps the bucket from sliding off, it is called a safety hook, is it not?
"A  Yes.
"Q  Have you ever used open hooks on prior jobs for Okada Trucking Company in pouring concrete?
"A  Yes, I have."

The accident occurred when Kekaha was trying to see if he could reach an area which was yet to be filled with concrete. After determining that he would be able to reach the area, he swung the boom away, and the bucket slipped off the hook. The plaintiff was working on the highest completed floor of the building. When the bucket slipped off the hook, it hit the plaintiff on the thigh and he was knocked to the ground.

In his amended complaint including amendments allowed by the court at the conclusion of the trial, the plaintiff alleged:

"That on or about October 17, 1956, Plaintiff was working as a carpenter employed by United Construction Co., Ltd., a Hawaiian corporation, on the sites of the construction of a dormitory on the campus of the University of Hawaii on the easterly side of Dole Street in aforesaid Honolulu; that at said time and place, Plaintiff was working on the first floor[4] of said building under construction where a concrete wall was being poured; that prior to said time and place one Samuel Kekaha, an employee of the Defendant, did rig a mechanical power crane, to-wit a No. 25 crane manufactured by the Northwest Engineering Company of Chicago, Illinois, within the scope of his employment and prior to the rental of said crane and rig by United Construction Co.; that to said crane was attached a large heavy bucket which was at the time of the accident hereinafter denoted being used to convey and transport mixed concrete from a concrete mixing truck to the concrete forms for the said wall, in the immediate vicinity of the Plaintiff, into which concrete was being poured from said bucket; that this bucket was sus-

---

[4] There is testimony that the plaintiff was working on the first deck or second floor.

pended from the crane by means of a hook attached to said crane by said Samuel Kekaha, at the time of said hook attachment the employee of Defendant Okada Trucking Co.; that said hook was an open hook not equipped with the proper safety device or attachment to prevent the bucket from slipping from the hook but instead was insecurely wired; that the bucket slipped from the hook and fell, striking the person of the Plaintiff, and thus knocking him from the second floor[5] of the structure to the first floor thereof, a distance of some twelve (12) feet, and thus causing the injuries to Plaintiff more particularly hereinafter set forth; that the sole and proximate cause of said injuries was the negligence of the Defendant's employee Samuel Kekaha in utilizing said hook not equipped with the proper safety device to prevent the bucket from slipping from the hook, and/or the negligent supplying of said open hook by the Defendant Okada Trucking Co."

Defendant contended that any negligence on the part of Samuel Kekaha was attributable to United Construction Company and not to defendant, Okada Trucking Company, inasmuch as Samuel Kekaha was the "borrowed employee" of United Construction Company under R.L.H. 1955, § 97-1.[6]

---

[5] See footnote 4, *supra*.

[6] This section, so far as here applicable, reads:

"§ 97-1. *Definition.* * * *

\*      \*      \*      \*      \*      \*      \*      \*

" 'Workman' is used as synonymous with 'employee,' and means any person who has entered into the employment of, or works under contract of service or apprenticeship with, an employer. It does not include a person whose employment is purely casual and not for the purpose of the employer's trade or business; provided, that where an employee is loaned or hired out to another person (herein referred to as the 'borrower'), for the purpose of furthering the borrower's trade or business, the employee shall, beginning with the time when the control of the employee is transferred to the borrower and continuing until he is again returned to the control of the original employer, be deemed to be the borrower's employee regardless of whether he is paid directly by the borrower or not."

Subsequent to the filing of the pleadings, but prior to the trial, on motion of defendant, the trial court granted a partial summary judgment for defendant. The specific ruling of law was that "* * * at the time and place of operation in question and complained of in the amended complaint, Samuel Kekaha was a borrowed employee of the United Construction Company, Limited, within the meaning of section 97-1, Revised Laws of Hawaii 1955, and was not therefore an employee of the defendant." There is no specification of error as to this judgment.

The case proceeded to trial on the remaining claim that appellee had supplied defective equipment. The plaintiff's theory was that defendant, as a bailor for hire, breached its duty to furnish a safe chattel by furnishing a crane for pouring concrete which had a hook without the usual safety clasp or locking device, which it knew, or in the exercise of ordinary care should have known was unsafe for the particular job intended.

At the close of the evidence, both parties moved for a directed verdict, pursuant to H.R.C.P., Rule 50. The trial court denied plaintiff's motion and granted defendant's motion for a directed verdict. From these rulings, the plaintiff appeals and asks this court either to reverse the order directing verdict for defendant and remand for a new trial, or to reverse the order directing such verdict, grant plaintiff's motion for a directed verdict, and remand for submission to the jury the sole issue of the amount of damages.

The trial court directed the verdict for the following reasons:

"Somehow it seems to me absolutely clear that the crane, the shackle and the hook, even if the hook was attached to the shackle before the bailment began, were all safe instrumentalities in proper condition and that

594

the evidence is clear that the bailment began not later than half an hour before the pour if you look at the case in the way most favorable to the plaintiff; that means that at the time the hook was attached to the bucket, the crane operator was an employee of the United Construction Company and the same man who was operating the crane in his capacity as a borrowed servant and therefore an employee of the United Construction Company was the man whom the evidence shows had attached the hook to the shackle so that he certainly knew that he could detach the hook from the shackle, and the shackle, according to undisputed evidence, was the equivalent of a safety hook so that it would seem that the new evidence that came in this morning doesn't materially change the case as far as a directed verdict for the defendant would go. I mean, in other words, if the hook was on the shackle at the beginning of the bailment, the United Construction Company employee, Mr. Kekaha, after the beginning of the bailment was negligent in not taking the hook off and using the shackle instead."

In answer to the question by plaintiff's counsel: "Did I hear the court correctly that at the time he [attached] the hook it is the court's ruling that he was the employee of United Construction Company?," the court replied: "No, no, I didn't say that. I think that that is immaterial because it's the—the crane had a shackle, the shackle was equivalent to a safety hook. The United Construction Company's employee, when he used the crane in the pouring operation, did not use the shackle as a safety hook. Instead, he used the open hook and he could have used the shackle as a safety hook. In other words, the shackle, equivalent to a safety hook, was right there on the crane and there is not the slightest evidence of any defect in the

crane, the shackle, or the hook, I mean, not the slightest."[7]

This court thus understands the lower court's ruling to be: (1) that Samuel Kekaha, the crane operator, was the borrowed employee of United Construction Company during the period of rental, *i.e.,* at one-half hour or one hour prior to the beginning of the pour, (2) that the crane, the shackle and the hook were safe instrumentalities in the sense that there was no hidden defect,[8] (3) that the proximate cause of the accident and ensuing injury to the plaintiff was Kekaha's negligence in failing to remove the hook

---

[7] "THE COURT: It seems to me that maybe this motion to amend should be granted in its form but somehow I can't see how it makes any difference on the directed verdict question because it would seem to me that for one thing the hook was not defective in any respect whatsoever —I mean the hook didn't have a crack in it, it wasn't about to fall apart, it was just a perfectly good hook of that type of hook and it was screwed into the shackle or attached to the shackle and could be detached from the shackle and Samuel Kekaha, who was the operator at the time of the accident, knew it could be detached from the shackle because he had attached it to the shackle sometime earlier that morning and whether, at the time he attached the hook to the shackle, he was an employee of Okada Trucking Company or whether he was an employee of United Construction, it seems to me, is of no importance; and, also, if the bucket was still on the ground in the morning and Mr. Kekaha attached the hook to the bucket prior to the pour, prior to half an hour or prior to an hour before the pour, prior to the time when the bailment began, what difference would it make because at the time of the lifting up of the bucket would be the time when it would be negligent to swing a bucket around with an open hook so that it would be at the time the bucket was lifted off the ground that the negligence would start occurring in view of the fact that the bucket was not attached to the crane by means of a shackle, which would be equivalent to a safety hook, so it seems to me you have got the same situation whether the hook was in the pickup truck or whether the hook was attached to the shackle, you've got a choice given to Kekaha as an employee of United Construction Company to either use the safety hook in the form of the shackle or to use the open hook in the form of the hook attached to the shackle and he made his choice."

[8] It is difficult to understand the reasoning of the trial court inasmuch as it states that "there is not the slightest evidence of any defect in the crane, the shackle, or the hook, I mean not the slightest," and yet it finds Kekaha negligent "in not taking the hook off and using the shackle instead." If the hook were safe, then there would be no duty on Kekaha to remove the hook and use the shackle in its place. The trial court evidently meant that there was no hidden defect.

and not attaching the concrete bucket directly to the shackle or clevis at the time the bailment began, and (4) that this act of negligence on the part of Kekaha must be attributed to United Construction Company, since it was committed within the time of the bailment, when Kekaha was the "borrowed employee" of United Construction Company. At this point we note that the partial summary judgment which held that Kekaha was a "borrowed employee" covers the entire period of the bailment, and it has not been specified as error.

The trial court divided the crane, the hook and shackle into separate instrumentalities, and it neglected to consider the assembled crane as a whole. The assembled crane which was delivered to the dormitory construction site had a hook attached to the shackle. The jury might have found that the rental was for an entire unit for a specific purpose. If so, the fact that there was no hidden defect was not decisive.

The assembled crane which was delivered to the jobsite had a hook which was an open hook, as differentiated from a safety hook. Charles J. Utterback, the sole expert witness on safety engineering, testified: "A safety hook is a hook that has a locking device across the throat so that the object being hoisted or pulled by the hook cannot escape while it's being under load, * * *. [The safety clasp or locking device] * * * is made out of the same material, most of them. This most generally is spring material, which is generally harder material than the hook. * * * In a majority of the safety hooks it [the safety clasp or locking device] is a flat piece, spring steel, which is about a quarter of an inch thick and a half an inch wide. It goes across the mouth, what we call the 'throat' here." The hook in this case had no such safety clasp or locking device. Mr. Utterback explained that in crane hoisting

operations there is a process called "mousing the hook."[9] When a hook is "moused," it will perform the same functions as the safety clasp or locking device. He also explained that an open hook may be "moused," that sisal or manila rope was generally used in this type of operation, but on occasions he has seen wires used. He further testified that the open hook used in this concrete pouring operation was "hard to mouse" with sisal or rope because the hook was "strained," and also "due to the fact that the indentation" on the hook was small. He also stated that the use of wire across the mouth or the throat of the open hook used in this concrete pouring operation does not con-

[9] With reference to the hook and mousing procedure, Mr. Utterback's testimony is as follows:

"Q (Plaintiff's counsel) Mr. Utterback, I show you Plaintiff's Exhibit No. '2' and I ask you what kind of hook is pictured in that photograph.
"A It's an open hook.
"Q Now, Mr. Utterback, you will notice that across the mouth or the throat of this hook is a piece of wire. Does that not convert the hook from an open hook to a safety hook?
"A No, sir.
"Q Mr. Utterback, is there such a term in cranes and hoisting gear known as 'mousing'?
"A Yes, sir.
"Q Will you explain to the court and jury what mousing is?
"A I would show it on the hook, if you don't mind.
"Q Very well.
"MR. MOORE: May the record show that witness has gone to the board?
"A When we mouse a hook, which is a phrase used in construction, 'mousing a hook,' we wrap something around the eye here, below the eye and below the hook here. When we are mousing in the safety device, we always use rope, manila rope or a rope that will not slip; but that is called 'mousing' and the idea of it is to—so that it will perform the same functions as this here. It's most generally used in hoisting and placing in stairwells or the sides of ships and so forth like that. You have moused the hook. It is something done in a hurry where—but we most generally use, I would say, sisal or manila rope.
"Q Now, Mr. Utterback, the flange of the hook, the portion of the hook that is not attached to the cable, is there anything different about that portion of the flange when you mouse?
"A There are different hooks. Sometimes you're—no two hooks are alike. If you use a hook, you're—
"Q Let me ask you this question, Mr. Utterback. With respect to

vert it into a safety hook. It was his professional opinion that the cause of the accident was the use of an open hook.

Defendant did not offer any testimony to contradict plaintiff's expert witness as to the condition of the hook. There is no testimony in the record as to when, where or by whom, the wire mousing was placed on the hook. Likewise, there is no testimony as to the time when or by whom the bucket was placed on the hook. There was testimony to the effect that if the hook had been removed entirely and the concrete bucket attached directly to the shackle or clevis, "if it is secured properly," that that method of attachment would have had the same effect as a safety hook. However, there was no testimony as to the usual

---

Plaintiff's Exhibit No. '2,' could this hook be effectively moused?

"A Not very well because the strain has pulled—you see, you have it straight here. What I'm talking about is this. When you mouse the original hook before it has strained, it will not—it will have more of a hook here, if you will notice. Now this manufacturer has made this a little different, it looks to me like, whether it has strained or not, but it is certainly hard to mouse that due to the fact that your indentation is so small there. If it isn't very small here, this portion could rest against your swivel, but the mousing of this here was so—the indentation of your hook is—it would be very hard to mouse.

"Q Now, supposing, Mr. Utterback, that in reducing this hook shown on Plaintiff's Exhibit No. '2', instead of mousing with rope you moused with wire, would that mousing then make this a safety hook?

"A Well, may I refer to this? Steel against steel slips. If you had a—in wet weather, if you were walking with a heel—with a nail in your heel, you'll slip. The same thing is true with a hook. If you wrap wire around there and you are working in concrete or whatever you're working at, if there is water, it's raining, it will get wet and it will slip off immediately. Wire is basically annealed wire, that is, it is annealed and it slips very quickly. You have a straight hook there so it isn't enough to—the purpose of wiring is to make it safe before it could slip off.

\* \* \* \* \* \* \* \* \* \*

"Q (Plaintiff's counsel) \* \* \* Now I ask you again, Mr. Utterback, let us assume that the heavy equipment that is pictured in Plaintiff's Exhibit No. '1' was in operation, that the bucket or receptacle on this hook came off and fell on or near a workman, causing injury, do you have a professional opinion, based upon your experience, and so forth, as to the causation of that accident?

"A It would be caused by using an open hook."

and proper practices of a contractor, through its foreman or other employee, in respect to the use of this type of equipment.

Viewing the case as we must from the standpoint most favorable to plaintiff, the defendant knew that the crane was to be used for the purpose of hoisting and pouring concrete. In view of that knowledge, the jury could find that defendant was negligent in supplying an assembled crane including a hook which was unsafe, and that this was a violation of defendant's duty of care. See 8 Am. Jur. 2, *Bailments,* § 262-63; 8 C.J.S., *Bailments,* §§ 25, 40; Restatement, *Torts,* §§ 388, 389, 390, 392, 405, 407. "* * * [A] lessor or lender of a chattel is liable to those third persons whom he should expect to use the chattel, or to be in the vicinity of the probable use, for injuries resulting from the use of the chattel, where he knows or should realize that the chattel is likely to be dangerous for use, and has no reason to believe that such persons will realize its dangerous condition, and fails to exercise reasonable care to inform them thereof. * * *" 8 C.J.S., *Bailments,* § 40 at 479. As stated in Restatement, *Torts,* § 408:

> "Sec. 408. One who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be in the vicinity of its probable use, for bodily harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it."

"It is now generally agreed that a seller, or other supplier of chattels for a consideration, may be liable for harm to the person or property of a third person who may be expected to be in the vicinity of the chattel's probable use, if he has failed to exercise reasonable care to make the

chattel safe for the use for which it is supplied." Prosser, *Torts,* § 84 (2d ed.).

"* * * [T]he law is the 'source' of a duty of the supplier of a chattel to use reasonable care to see that it is reasonably safe for use, even where there is not actual knowledge of the presence of a defect, or knowledge of facts which would indicate a defect exists, where the nature of the chattel and its use are such 'that it is reasonably certain to place life and limb in peril' when defectively made or repaired, and it is probable that it will be used without inspection by others than a party who could claim the benefit of an implied warranty. * * *" *La Rocca* v. *Farrington,* 276 App. Div. 126, 93 N.Y.S.2d 363, 366, *aff'd,* 301 N.Y. 247, 93 N.E.2d 829; *Scharf, Admx.* v. *Gardner Cartage Co.,* 95 Ohio App. 153, 113 N.E.2d 717; *Zucker* v. *Passetti Trucking Co.,* 191 Cal. App. 2d 260, — P.2d —, 12 Cal. Rptr. 692; *Aircraft Sales & Service, Inc.* v. *Gantt,* 255 Ala. 508, 52 So. 2d 388; *Moon* v. *Northern Pac. Ry.,* 46 Minn. 106, 48 N.W. 679; *Minicozzi* v. *Atlantic Refining Co.,* 143 Conn. 226, 120 A.2d 924; *Coughtry* v. *Globe Woolen Co.,* 56 N.Y. 124; *Hilleary* v. *Bromley,* 146 Ohio St. 212, 64 N.E.2d 832; *Roberts* v. *Geo. M. Brewster & Son, Inc.,* 13 N.J. Super. 462, 80 A.2d 638.

In *Scharf, Admx.* v. *Gardner Cartage Co., supra,* the plaintiff charged that the defendant was negligent in supplying plaintiff's employer a defective boom section for use on a moto-crane. Sometime prior to the accident, plaintiff's employer requested the defendant to deliver to the job three 20-ton moto-cranes with 65 foot boom sections attached. Furnished also were crane operators and oiler, employees of defendant, at an agreed rental of $120.00 a day. The accident occurred when a spot welded boom section collapsed. The evidence showed that the boom section had been welded with a metal that was of a softer strain

than the boom, and that the weld had been painted over. There was a conflict in the evidence as to whether defendant supplied the defective boom section. The court said:

> "From the evidence, we conclude that questions of fact were presented for determination by the jury under proper instructions by the court as to whether Gardner was negligent in failing to supply a boom section which was reasonably safe and suitable for use in the performance of the work, and whether such negligence, if any, proximately caused or proximately contributed to cause the death of plaintiff's decedent.

> "This is true, we think, even though Eichleay may have been guilty of negligence also in failing properly to inspect the equipment. In other words, if Gardner was negligent, Gardner would not be relieved of liability because decedent's employer, Eichleay, was negligent in not discovering the negligence or preventing its natural result." *Scharf, Admx.* v. *Gardner Cartage Co., supra* at 164, 113 N.E.2d at 722.

See *Rosebrock* v. *General Elec. Co.,* 236 N.Y. 227, 140 N.E. 571.

Likewise, in *La Rocca* v. *Farrington,* 301 N.Y. 247, 93 N.E.2d 829, where it was contended that the crack in one of the chain links should have been discovered by the lessee of the tractor crane, the court said:

> "The fact that the plaintiff's employer, as lessee of the crane, had an equal opportunity to discover the defect * * * does not serve to relieve the owner [defendants-appellants] of liability * * *." *La Rocca* v. *Farrington, supra* at 250, 93 N.E.2d at 830.

In *Wujnovich* v. *Equipment Corp. of America,* 54 F. Supp. 465, the plaintiff, an employee of Crucible Steel Company, sued the defendant for injuries sustained when the boom attached to a caterpillar crane, leased by plain-

tiff's employer from defendant, gave way and fell upon him. It was alleged that the fall and collapse of the crane and boom was due to the negligence on the part of defendant in the assembly of the crane boom prior to the leasing of the crane to the Crucible Steel Company. The Crucible Steel Company, the employer of plaintiff, was made a third-party defendant, upon motion of the defendant, Equipment Corporation. Defendant charged that the third-party defendant was solely negligent, or jointly negligent with defendant, which allegation was denied by the third-party defendant. Plaintiff did not amend his complaint to charge his employer with negligence. The case was tried before a jury with the result that the plaintiff recovered a verdict against defendant, Equipment Corporation; and, on the third-party complaint, the jury rendered a verdict in favor of the third-party defendant, Crucible Steel Company. The defendant, Equipment Corporation, moved to set aside the verdict, and presented for consideration, on a motion for a new trial, the question of whether the Crucible Steel Company was negligent in failing to inspect the leased equipment. In answer to this question, the court said: "We said to the jury: 'If the Crucible Steel Company failed to make an examination of this equipment when it came to it, that of itself would not relieve the Equipment Corporation from the responsibility of the result of an improper assembly of this socket, wedge and cable; when they assembled it they should have put it together with equipment and wedges that would properly hold the load that the crane, as leased by Crucible Steel Company, was intended to be used.' " *Wujnovich* v. *Equipment Corp. of America, supra* at 466.

While these cases relate to hidden defects the same principle is applicable if "* * * the condition, although readily observable, [is] one which only persons of special experience would realize to be dangerous. In such case if

the supplier, having such special experience, knows that the condition involves danger and has no reason to believe that those who use it will have such special experience as will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize." Restatement, *Torts,* § 388, comment *i.*

The jury could have found that, immediately after the agreement was reached to rent the crane with Kekaha as the operator, Kekaha, as the general employee of defendant, as part of his preparation of the equipment for the concrete pouring operation, attached the hook to the crane.[10] As a crane operator, Kekaha had used this type of hook in concrete pouring operations in the past and in his capacity of borrowed employee—assuming he was such at that time—he may have "moused" the hook, acting in the same manner as he had done on other jobs. There was nothing said by defendant to the lessee regarding the danger inherent in the use of the hook which was attached to the crane. There was a question for the jury as to whether defendant, as a supplier of cranes for various purposes, should be deemed a person who knew or should have known (1) that the open hook attached to the crane presented a dangerous condition under the circumstances of, and considering the purposes of, the hiring, and (2) that the dangerous condition, though readily observable, would not be realized by United Construction Company or its employees. Therefore, we conclude that Kekaha's failure to remove the hook and attach the bucket to the shackle, if it were he who was responsible, does not, as a matter of law, relieve defendant of liability for supplying an unsafe crane for the purpose of hoisting and pouring concrete,

---

[10] See footnote 3, *supra.* There was no evidence that this was outside the course of his employment by defendant, the bailor.

even though Kekaha at that time may have been a "borrowed employee" of United Construction Company.

Hence, after a careful review of the evidence, we are of the opinion that there are questions of fact to be presented to the jury as to whether defendant was negligent in supplying an assembled crane including a hook which was not reasonably safe and suitable for the purpose intended and whether such negligence, if any, proximately caused plaintiff's injury.

As we have indicated, it is our opinion that there are questions of fact to be presented to the jury, including those stated in the preceding paragraph which concentrate on the primary issue under this appeal.

Reversed and remanded for a new trial.

*Moore & Moore* (*Willson C. Moore, Jr.*) for plaintiff-appellant.

*Robertson, Castle & Anthony* (*Frank D. Padgett* and *Alexander C. Marrack*) for defendant-appellee.