Aleo v. SLB Toys USA, Inc.

## MICHAEL ALEO[1] vs. SLB TOYS USA, INC.,[2] & others.[3]

Essex. May 6, 2013. - September 13, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Evidence,* Hearsay, Police report, Spontaneous utterance, Medical report, Expert opinion. *Negligence,* Defective product, Expert opinion, Standard of care, Gross negligence, Wrongful death. *Warranty. Damages,* Punitive.

In a civil action arising from an accident involving an inflatable swimming pool slide that had been imported and sold by the defendants, the judge did not abuse his discretion in excluding statements regarding the accident that were included in a police report, where there was no evidence that the unknown declarants of those statements had personal knowledge of the accident [403-404]; likewise, the judge did not abuse his discretion in excluding statements regarding the accident that were made in the decedent's medical records, where the statements were not made from the personal knowledge of the recorders or of anyone who witnessed the accident [405]; finally, there was no abuse of discretion in the judge's decision to limit certain proffered opinion testimony of an expert witness for the defense, where it was not based on sufficient facts or data [405-406].

In a civil action arising from an accident involving an inflatable swimming pool slide that had been imported and sold by the defendants, it was reasonable for the plaintiff, based on evidence that the slide was not tested or certified under the relevant Federal regulations, to argue that the slide was "illegal." [406-407]

In a wrongful death action arising from an accident involving an inflatable swimming pool slide that had been imported and sold by the defendants, who failed to ensure that the slide complied with Federal standards, there was sufficient evidence at trial to support the jury's findings of negligence [407-409], breach of the implied warranty of merchantability [410], and gross negligence [410-411]; further, the jury's award of punitive damages, which was authorized by statute, in the amount of $18 million could not be categorized as so excessive as to violate due process, given that the defendants' conduct evinced a substantial degree of reprehensibility, the ratio of the punitive damages award to actual harm inflicted (i.e., the jury's award of compensatory damages) was within the range that generally accords with due process, and a comparison of punitive damages to possible civil penalties suggested that the amount of the punitive damages award did not exceed constitutional bounds [411-421].

[1]Individually and as administrator of the estate of Robin Aleo.

[2]Doing business as ToyQuest.

[3]Amazon.com, Inc.; Amazon.com Kids, Inc., individually and as successor in interest to Rock-Bound, Inc.; Toys "R" Us, Inc.; and Toysrus.com, LLC.

CIVIL ACTION commenced in the Superior Court Department on October 31, 2008.

The case was tried before *Howard J. Whitehead*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Gregory T. Parks*, of Pennsylvania (*John J. McGivney* with him) for Toys "R" Us, Inc., & another.

*W. Thomas Smith* (*Benjamin R. Zimmermann* with him) for the plaintiff.

The following submitted briefs for amici curiae:

*Deborah R. White*, of Virginia, & *Ashley C. Parrish & Karen F. Grohman*, of the District of Columbia, for Retail Litigation Center, Inc.

*Frederick B. Locker*, of New York, & *Thomas E. Peisch & Christopher K. Sweeney* for Toy Industry Association, Inc.

*Hugh F. Young, Jr.*, of Virginia, *John M. Thomas*, of Michigan, & *David R. Geiger & Joseph P. Lucia* for Product Liability Advisory Council, Inc.

*Thomas B. Drohan & Carl Valvo* for Retailers Association of Massachusetts.

*Christopher P. Flanagan & Christopher J. Seusing* for Massachusetts Defense Lawyers Association.

*Mary Alice McLarty & Jeffrey White*, of the District of Columbia, & *Timothy C. Kelleher & Thomas R. Murphy* for American Association for Justice & another.

LENK, J. In 2006, while visiting relatives in Andover, twenty-nine year old Robin Aleo[4] attempted to use an inflatable swimming pool slide that had been imported and sold by Toys "R" Us, Inc., and Toysrus.com, LLC (collectively, Toys R Us).[5] She slid down head first; when she reached the bottom of the slide, it collapsed, and her head struck the concrete deck of the swim-

---

[4]Because Robin Aleo and her husband Michael Aleo, the plaintiff in this matter, share a last name, we refer to each by his or her first name. We also refer to Michael as "the plaintiff."

[5]We acknowledge the amicus briefs of the American Association for Justice and the Massachusetts Academy of Trial Attorneys; the Product Liability Advisory Council, Inc.; the Retail Litigation Center, Inc.; Toy Industry Association, Inc.; the Retailers Association of Massachusetts; and the Massachusetts Defense Lawyers Association.

ming pool through the fabric of the slide. Robin's upper two cervical vertebrae fractured, resulting in quadriplegia. She died the following day, after her family, in accordance with her wishes, decided to withdraw life support.

In 2008, Michael Aleo, Robin's widower, filed an action in the Superior Court, both individually and as administrator of Robin's estate, against SLB Toys USA, Inc., and Amazon.com, Inc., alleging negligence, breach of the implied warranty of merchantability, wrongful death, and violation of G. L. c. 93A.[6] Subsequently, Toys R Us and Amazon.com Kids, Inc., were added as additional defendants.[7] A Superior Court jury found Toys R Us liable for negligence, breach of warranty, and wrongful death, awarding compensatory damages in the amount of $2,640,000.[8] The jury also found Toys R Us grossly negligent and awarded punitive damages in the amount of $18 million. See G. L. c. 229, § 2 (punitive damages available for gross negligence in wrongful death action).[9] The judge denied Toys R Us's posttrial motions for a new trial on all issues, judgment notwithstanding the verdict, and a new trial on damages subject to remittitur, and Toys R Us, represented by new counsel, appealed. We allowed both parties' applications for direct appellate review.

Toys R Us challenges certain pretrial rulings, the sufficiency of the evidence, and the constitutionality of the $18 million award of punitive damages. We discern no error in the judge's evidentiary rulings or in his ruling permitting the plaintiff to argue that the slide was "illegal," and we conclude that there was sufficient evidence to support the jury's findings of negligence, breach of warranty, and gross negligence. We conclude

[6]SLB Toys USA, Inc., is the vendor from whom Toys "R" Us, Inc., and Toysrus.com, LLC (collectively, Toys R Us), purchased the slide. Amazon.com, Inc., is the entity that delivered the slide to Robin's relatives in Andover; Toys R Us shipped the slide to Amazon.com, Inc., which in turn shipped the slide to customers who ordered the product via the Toys R Us "portal" on Amazon.com, Inc.'s Web site.

[7]Defendants SLB Toys USA, Inc., Amazon.com, Inc., and Amazon.com Kids, Inc., settled the claims against them during trial; they are not parties to this appeal.

[8]As indicated on the special jury verdict form, the compensatory damages comprised $2,540,000 for the "fair monetary value" of Robin to Michael and to the couple's daughter, plus $100,000 for Robin's conscious pain and suffering.

[9]The G. L. c. 93A claims were dismissed by stipulation.

as well that the jury's award of punitive damages does not exceed constitutional limits.

1. *Background.* We recite the facts the jury could have found, reserving some facts for later discussion. In 2005, Toys R Us decided to purchase a product called Banzai Falls In-Ground Pool Slide from a vendor in China and import it into the United States for sale. The Banzai Falls In-Ground Pool Slide is made of a tent-like fabric with a rubber-coated sliding surface and is sold with an electric fan used to inflate it. The slide is intended to be installed adjacent to an in-ground swimming pool, so that a person using the slide may descend the slide ramp into the pool.

Before the slide was imported into the United States, Bureau Veritas, an independent testing laboratory, was retained by Toys R Us to evaluate it. Bureau Veritas conducted various tests that were requested by either Toys R Us or the Chinese vendor. Bureau Veritas produced certificates indicating that the slide had been tested for compliance with United States Federal regulations and toy industry standards regarding lead content, flammability, electronically operated toys, soluble heavy metals content, mechanical hazards, electric fans, labeling, and sharp points and edges. There was no indication that Toys R Us or the vendor in China requested that the slide be tested, or that the slide was tested, for compliance with 16 C.F.R. § 1207 (1978) (§ 1207), a Federal safety standard applicable to all swimming pool slides "regardless of the materials of manufacture or structural characteristics of the slides." 16 C.F.R. § 1207.1(b)(2) (1978).[10] The certificates of compliance produced by Bureau Veritas were

---

[10]The Federal safety standard for swimming pool slides was promulgated to "reduce or eliminate the unreasonable risks of death or injury associated with swimming pool slides," 16 C.F.R. § 1207.1(a) (1978), including "quadriplegia and paraplegia resulting from users (primarily adults using the swimming pool slide for the first time) sliding down the slide in a head-first position and striking the bottom of the pool." 16 C.F.R. § 1207.1(b)(1) (1978). The standard defines "swimming pool slide" as "any device used to enter a swimming pool by sliding down an inclined plane." 16 C.F.R. § 1207.3(a)(28) (1978). It sets forth design requirements, 16 C.F.R. § 1207.5 (1978), and mandates testing for compliance before a slide permissibly may be imported or sold in the United States, 16 C.F.R. § 1207.9 (1976).

Among the design requirements imposed are that a slide be capable of supporting three hundred fifty pounds, 16 C.F.R. § 1207.5(f)(9)(i), and that a

sent to an employee in Toys R Us's safety assurance department who received approximately 4,000 certificates of this kind per month. Ultimately, Toys R Us imported approximately 4,000 Banzai Falls In-Ground Pool Slides into the United States for sale.

In 2006, Sarah Letsky purchased a Banzai Falls In-Ground Pool Slide from Toys R Us using the Internet. She and her husband, William Letsky, who is Michael's uncle, installed the slide beside the swimming pool at their home in Andover. That summer, Robin and Michael, along with their fifteen month old daughter, visited the Letskys. On July 29, a number of people, including the Aleos and the Letskys, as well as additional family and friends, were gathered around the Letskys' pool. Robin, who weighed approximately one hundred forty-five pounds, climbed to the top of the slide, paused on the platform there, spoke a few words to a friend, and descended head first. The bottom part of the slide was underinflated and collapsed under her weight. As a result, Robin's head struck the pool ledge through the fabric of the slide. She slid into the water and came up motionless.

Michael, along with his uncle and another man, removed Robin from the pool, and Michael administered cardiopulmonary resuscitation. Robin was taken by helicopter to Brigham and Women's Hospital in Boston, where she was placed on a ventilator and diagnosed with a severed spinal cord. Doctors advised her family that she would never breathe or move on her own again. At the hospital, Robin awoke for approximately three seconds and told Michael, "I can't feel anything." The next day, Michael, along with Robin's parents, decided to remove life support, as Robin previously had stated that she would not want to be kept alive under such conditions.

2. *Discussion.* Toys R Us argues that (1) certain evidence of misuse of the slide was improperly excluded at trial, (2) the judge erred in permitting the plaintiff to refer to the slide as "illegal" before the jury, (3) there was insufficient evidence to

---

slide be tested for head-first sliding. 16 C.F.R. § 1207.5(f)(5)(ii). The instruction manual included with the Banzai Falls In-Ground Pool Slide, as well as a warning label affixed to the rear of the slide, states that the weight limit for the slide is two hundred pounds and that head-first descent is dangerous.

establish negligence or breach of warranty, (4) there was insufficient evidence to establish gross negligence, and (5) the award of punitive damages was so excessive as to violate due process.[11]

a. *Evidence of misuse.* At trial, Toys R Us sought to establish that Robin misused the slide by jumping or diving, rather than sliding, from the platform at the top of the slide. It contends that the judge improperly excluded three types of evidence indicating misuse: hearsay statements in a police report, hearsay statements in medical records, and the opinion of one of Toys R

---

[11]Toys R Us makes three additional claims that were not properly preserved for appellate review. First, Toys R Us argues that the judge erred in concluding that 16 C.F.R. § 1207 (1978) (§ 1207) applies to the Banzai Falls In-Ground Pool Slide. However, Toys R Us failed to object to the admission or applicability of § 1207 at trial. Pretrial, Toys R Us stated that its only objection to the admission of § 1207 was that the judge allowed the text of the regulation to be introduced as an exhibit, so that the jury would have it with them during deliberations. At trial, Toys R Us made no objection when a copy of § 1207 was entered in evidence. Finally, prior to the jury charge, the judge informed the parties that he intended to instruct the jury that § 1207 applies to all pool slides, including the one at issue here, and Toys R Us made no objection. Subsequently, the judge did instruct the jury that § 1207 applies to all pool slides, including the one in this case, and Toys R Us made no objection. The issue has been waived. See *Cormier* v. *Pezrow New England, Inc.*, 437 Mass. 302, 311 (2002); Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974) ("No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection").

Second, Toys R Us claims that there was insufficient evidence of a safer alternative design. See *Evans* v. *Lorillard Tobacco Co.*, 465 Mass. 411, 428 (2013), quoting Restatement (Third) of Torts: Products Liability § 2 comment f, at 24 (1998) ("To establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm"). Toys R Us waived this argument by not raising it in its motions for a directed verdict or in the hearings on those motions. See *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34-35 (1991); Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974). In any event, § 1207 sets forth parameters for a safer alternative design.

Third, Toys R Us claims that the plaintiff improperly made reference in closing argument to an indemnity agreement between Toys R Us and the vendor in China. This claim was waived, because the judge gave a curative instruction on the issue in response to Toys R Us's objection, to the express satisfaction of Toys R Us, and there was no further objection. See *Harlow* v. *Chin*, 405 Mass. 697, 706 (1989), quoting *Commonwealth* v. *Cabot*, 241 Mass. 131, 151 (1922) ("if a judge fails to cure an alleged error, the judge is 'entitled at the end of the charge to have errors and omissions claimed to exist therein brought to his attention . . .' "). See also Mass. R. Civ. P. 51 (b).

Us's expert witnesses. We address each category of evidence in turn.[12]

i. *Statements in police report.* The judge allowed the plaintiff's motion to exclude statements regarding the accident that were included in a police report. An Andover police detective stated in his report, "According to family [members, Robin] was standing on top of a [six-foot] inflatable slide and attempted to dive off into the pool, but the slide gave way and she struck her head on the side of the pool . . . ." Toys R Us maintains that the statements should have been admitted as spontaneous utterances. See *Commonwealth* v. *Santiago,* 437 Mass. 620, 623 (2002).

"Generally, determinations as to the admissibility of evidence lie 'within the sound discretion of the [trial] judge.' " *Commonwealth* v. *Jones,* 464 Mass. 16, 19-20 (2012), quoting *Commonwealth* v. *Dunn,* 407 Mass. 798, 807 (1990). A spontaneous utterance may not be introduced in evidence unless there is evidence sufficient to support a finding that the declarant had personal knowledge of the matter in question. See *Commonwealth* v. *Harbin,* 435 Mass. 654, 657 (2002).

Here, the police report does not indicate which family members the detective spoke to, or whether the declarants had witnessed the accident. In his deposition, the detective stated that he could not identify the individuals who provided the information. Similarly, an Andover police sergeant, who was also at the scene, stated in his deposition, "I believe [Robin] went to jump off the slide and it deflated"; he indicated, however, that this information was provided to him by another police officer, and not by anyone with personal knowledge of the accident. Given that there was no evidence that the unknown declarants had personal knowledge of Robin's manner of descent, the judge did not abuse his discretion in excluding the statements.

---

[12]Toys R Us contends as well that it improperly was precluded from arguing at trial that Robin's head-first descent was unforeseeable and a misuse of the slide. This claim is unavailing. Although the trial judge allowed a motion in limine to preclude Toys R Us from presenting argument or evidence that Robin's head-first descent was unforeseeable or a misuse, at trial, counsel for Toys R Us elicited, without objection, substantial testimony from various witnesses regarding Robin's manner of descent and, in closing argument, stated that "the way [Robin] came off [the slide] . . . is not a foreseeable use."

ii. *Statements in medical records.* The judge also excluded statements regarding the accident that appeared in Robin's medical records. Specifically, medical records from the Andover fire-rescue department, Boston Med Flight, and Brigham and Women's Hospital make several references to Robin diving or jumping from the slide.

Statements in medical records are admissible, even though hearsay, where they are made "in the regular course of the institution's operation from the personal knowledge of the recorder or from a compilation of the personal knowledge of those who have an obligation in the course of their employment to transmit that medical information to the recorder." *Bouchie* v. *Murray*, 376 Mass. 524, 528 (1978). Such statements "may be admitted by the court, in its discretion." G. L. c. 233, § 79. See *Commonwealth* v. *Jones, supra.*

Here, the recorders were medical responders and professionals who treated Robin after the accident but did not have personal knowledge of the circumstances of the accident. The statements in the medical records describing Robin's means of descent, therefore, were not made from the personal knowledge of the recorders, nor were they made from the personal knowledge of those who had an obligation in the course of their employment to transmit that medical information to the recorders. See *Bouchie* v. *Murray, supra.* Further, as with the statements in the police report, there is no evidence that the statements in the medical records were based on the personal knowledge of anyone who witnessed the accident. See *Commonwealth* v. *Harbin, supra.* The judge did not abuse his discretion in excluding the statements.

iii. *Expert opinion.* The plaintiff moved in limine to exclude evidence of experiments and calculations conducted by Mari Truman, one of Toys R Us's expert witnesses. Truman's experiments involved sliding a mannequin down a Banzai Falls In-Ground Pool Slide and dropping the mannequin onto the bottom of the slide, to determine whether the slide would be more likely to collapse when a user was sliding or diving.[13] The plaintiff argued that evidence of the experiments should be

[13] In two of the three sliding tests, the mannequin's chest "bottomed out," striking the surface underneath the slide.

excluded, because Truman "testified that her experiments do not accurately reflect the occurrence of the accident."

The judge agreed that the tests did not sufficiently replicate the conditions of the accident. Nonetheless, he denied the plaintiff's motion, allowing the admission of evidence of the tests for its "limited utility" in demonstrating to the jury the physical properties of the slide. However, because the tests did not sufficiently replicate the conditions of the accident, the judge ruled that Truman could not offer her opinion, based on the tests, that Robin could not have been injured by sliding down the slide. Toys R Us maintains that the judge erred in precluding Truman from offering this opinion.

"The decision to exclude 'expert testimony rests in the broad discretion of the judge and will not be disturbed unless the exercise of that discretion constitutes an abuse of discretion or other error of law.' " *Palandjian* v. *Foster*, 446 Mass. 100, 104 (2006), citing *Commonwealth* v. *Pike*, 430 Mass. 317, 324 (1999). Expert opinion testimony may be excluded "where it amounts to no more than mere speculation or a guess from subordinate facts that do not give adequate support to the conclusion reached." *Sevigny's Case*, 337 Mass. 747, 751 (1958), and cases cited. Here, there were substantial differences between the conditions of Truman's experiments and the conditions of the accident: The mannequin was seven or eight inches taller than Robin, had a rigid neck and rigid arms, was pushed down the slide without its arms outstretched, and took approximately twice as long to reach the bottom of the slide as two witnesses testified it would have taken Robin to do. Given these differences, we discern no error in the judge's determination that the proffered opinion testimony was not "based upon sufficient facts or data." Mass. G. Evid. § 702 (a) (2011). Accordingly, there was no abuse of discretion in his decision to limit Truman's testimony.

b. *Ruling permitting plaintiff to refer to slide as illegal.* Toys R Us claims that the judge erred in allowing the plaintiff to argue at trial that the slide was "illegal." To the extent that the issue was preserved for appellate review,[14] we discern no error of law or abuse of discretion in the judge's ruling. See *Fialkow*

---

[14]Toys R Us moved in limine to preclude the plaintiff from referring to the

v. *DeVoe Motors, Inc.*, 359 Mass. 569, 572 (1971), and cases cited (where party objects to argument by opposing counsel, judge "has discretion to decide whether any action is required . . . . This court will not intervene in such a case where no abuse of discretion is shown"); *Posell* v. *Herscovitz*, 237 Mass. 513, 515 (1921) (judge has discretion in deciding whether to restrict content of opening statement). A copy of § 1207 was entered in evidence; the regulation applies to all swimming pool slides "regardless of the materials of manufacturer or structural characteristics of the slides," 16 C.F.R. § 1207.1(b)(2); and the jury was instructed, without objection, that it was "deemed . . . admitted that the [Banzai Falls In-Ground Pool Slide] was not tested or certified under [§ 1207]." On this evidence, it was reasonable for the plaintiff to argue the inference that the slide was an "illegal" product. See *Back* v. *Wickes Corp.*, 375 Mass. 633, 644 (1978) (counsel may argue fair inferences from the evidence).[15] Further, the judge instructed the jury that opening statements and closing arguments are not evidence, and Toys R Us did not request any additional instructions on this point. See *Fialkow* v. *DeVoe Motors, Inc.*, *supra*.

c. *Evidence of negligence and breach of warranty.* Toys R Us argues that there was insufficient evidence at trial to support the

slide as illegal. However, it did not object at trial when the plaintiff referred to the slide as illegal during opening statement and closing argument. See *Gath* v. *M/A-Com, Inc.*, 440 Mass. 482, 492 (2003), citing *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 666 n.3 (1980) ("Trial counsel in a civil case must object to the improper conduct of opposing counsel, thereby alerting the judge to the impropriety, to preserve the issue for appeal").

[15]To the extent that Toys R Us argues that the plaintiff should not have been permitted to refer to the slide as illegal because Toys R Us's own conduct fell under the safe harbor provision of 15 U.S.C. § 2068(b) (2006), which relieves a defendant of liability for importation of a nonconforming product where the defendant "relie[d] in good faith on the representation of the manufacturer or a distributor of such product that the product is not subject to an applicable product safety rule," the issue has been waived. While Toys R Us proposed a jury instruction on the safe harbor provision, the judge declined to give such an instruction, stating, "I don't see any evidence that . . . that exception would apply." The question of the applicability of the safe harbor provision thus was not put before the jury. Moreover, Toys R Us did not object to the judge's declining to instruct the jury on the safe harbor provision, and does not argue on appeal that the judge erred in declining to give the proposed instruction. See Mass. R. Civ. P. 51 (b).

jury's findings that Toys R Us was negligent and committed a breach of the implied warranty of merchantability.

"A violation of a statute, ordinance, or regulation, although not conclusive, is evidence of negligence on the part of a violator as to all consequences that the statute, ordinance, or regulation was intended to prevent." *Guinan* v. *Famous Players-Lasky Corp.*, 267 Mass. 501, 516 (1929), and cases cited. Here, a copy of § 1207 was entered in evidence. By its express terms, § 1207 applies to all swimming pool slides "regardless of the materials of manufacture or structural characteristics of the slides." 16 C.F.R. § 1207.1(b)(2). The regulation states that it was promulgated to "reduce or eliminate the unreasonable risks of death or injury associated with swimming pool slides," 16 C.F.R. § 1207.1(a) (1978), including "quadriplegia and paraplegia resulting from users (primarily adults using the swimming pool slide for the first time) sliding down the slide in a head first position and striking the bottom of the pool." 16 C.F.R. § 1207.1(b)(1) (1978).[16]

The regulation requires that all pool slides be capable of supporting three hundred fifty pounds, and that they be tested for head-first sliding. 16 C.F.R. § 1207.5(f)(9)(i), (5)(ii) (1978). The instruction manual included with the Banzai Falls In-Ground Pool Slide, as well as a warning label affixed to the slide, both of which were entered in evidence, states that the slide can support only two hundred pounds, and that head-first sliding may result in serious injury or death.[17] One of the plaintiff's expert witnesses testified that the slide failed to comply with the Federal

---

[16]Robin's injury closely tracks the one detailed in 16 C.F.R. § 1207.1(b)(1). She was an adult, she was using the slide for the first time, she slid down the slide head first, she struck her head, and she was rendered quadriplegic as a result. However, she did not strike her head on the bottom of the pool; rather, she struck her head on the pool ledge when the slide collapsed under her weight. Nonetheless, her injury was sufficiently similar to the one detailed in 16 C.F.R. § 1207.1(b)(1) for the jury to find that it was one of the consequences that § 1207 was intended to prevent. See *Guinan* v. *Famous Players-Lasky Corp.*, 267 Mass. 501, 516 (1929).

[17]There was expert testimony at trial that the warning label on the slide was inadequate for several reasons, including that (1) it was in a poor location, (2) the text of the label was printed in type that was too small, (3) the combination of blue text on a yellow background was hard to read, (4) the label mixed instructions and warnings together in a way that made the warnings not easily apparent, and (5) the label employed only text, with no graphics.

standard and that this failure caused Robin's death, while another testified that the slide was defective because it did not comply with "the requirements of the standards." Finally, the judge instructed the jury, without objection, that it was "deemed . . . admitted that the slide was not tested or certified under [§ 1207] prior to being imported and sold." This evidence was sufficient to support a finding that Toys R Us violated § 1207 and, thus, was sufficient to support a finding of negligence.

Toys R Us maintains that the evidence was insufficient to establish negligence because there also was evidence that the vendor warranted to Toys R Us that the slide would be free from defects and would conform with all laws, and because Toys R Us engaged Bureau Veritas to confirm that the slide met all applicable regulatory requirements. Essentially, Toys R Us argues that such evidence negates the other evidence of negligence by demonstrating that Toys R Us exercised reasonable care in importing the slide. The jury, however, were not required to credit the evidence of reasonable care by Toys R Us.

As an initial matter, Toys R Us failed to introduce a signed copy of its agreement with the Chinese vendor. The jury thus reasonably could have inferred that there was no signed and executed agreement containing a vendor warranty, and that the vendor therefore did not warrant to Toys R Us that the slide would be free from defects and would conform with all applicable laws. Further, the evidence of Toys R Us's arrangement with Bureau Veritas was equivocal. Documents entered in evidence indicated that, in testing the slide, Bureau Veritas performed only those tests that either Toys R Us or the vendor asked it to conduct.[18] Further, although a former Toys R Us employee testified that Toys R Us gave "standing instructions" to Bureau Veritas to determine which standards and regulations applied to the products it tested, he also testified that these instructions were not in writing, and that Toys R Us entered into a written agreement with Bureau Veritas to this effect only after Toys R Us began importing the slide. Accordingly, the jury could have found that Bureau Veritas had not been engaged to confirm that the slide met all applicable regulatory requirements.

---

[18]As stated, there was no evidence that Toys R Us or the vendor requested that Bureau Veritas test the slide, or that the slide was in fact tested, for compliance with § 1207.

As to the finding of breach of warranty, "[a] defendant in a products liability case in this Commonwealth may be found to have breached its warranty of merchantability without having been negligent, but the reverse is not true." *Hayes* v. *Ariens Co.*, 391 Mass. 407, 410 (1984), overruled on another ground by *Vassallo* v. *Baxter Healthcare Corp.*, 428 Mass. 1, 19-23 (1998). Thus, in a products liability case, as here, a finding of negligence necessarily encompasses a breach of warranty. *Id.* Because the evidence here was sufficient to support a finding of negligence, it follows that the evidence was also sufficient to support a finding of breach of warranty.

d. *Evidence of gross negligence.* Toys R Us argues as well that there was insufficient evidence of gross negligence. This issue was not preserved for appeal, as Toys R Us neither raised it below in its motions for a directed verdict, nor objected in any respect to the jury instruction given on gross negligence. Nonetheless, "[w]e choose in our discretion to discuss the issue," *Clark* v. *Rowe*, 428 Mass. 339, 341 (1998), as the jury's award of punitive damages, discussed *infra*, rests on its finding of gross negligence. See G. L. c. 229, § 2.

The long-standing definition of gross negligence in Massachusetts was set forth in *Altman* v. *Aronson*, 231 Mass. 588, 591-592 (1919):

> "Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference *to* present legal *duty and to* utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence."

Here, as stated, § 1207 was entered in evidence. The regulation requires that all pool slides be capable of supporting three hundred fifty pounds, 16 C.F.R. § 1207.5(f)(9)(i), and be tested for head-first sliding, 16 C.F.R. § 1207.5(f)(5)(ii). The instruction manual included with the slide, as well as the warning label affixed to the slide, states that it can support only two hundred pounds, and that head-first sliding is dangerous. The judge instructed the jury that it was "deemed . . . admitted that the slide was not tested or certified under [§ 1207]."

Further, the jury could have found that the vendor did not warrant to Toys R Us that the slide complied with all applicable standards and regulations; that Bureau Veritas had not been engaged to determine which standards and regulations applied to the slide, but rather was instructed simply to perform certain specified tests; and that Toys R Us retained but one employee in its safety assurance department to review approximately 4,000 certificates of compliance per month. Finally, there was testimony that an indemnity provision in Toys R Us's purported vendor agreement meant that, if Toys R Us lost money due to a product defect, it could try to recover the money from the Chinese vendor. Based on this testimony, the plaintiff permissibly argued, and the jury could have found, that Toys R Us was indifferent to the safety of the slide, because it believed it would not be financially liable for any defects.

On this evidence, the jury could have determined that Toys R Us's conduct evinced "want of even scant care" as to the safety of its customers. *Altman* v. *Aronson, supra.* The jury could have found that Toys R Us was indifferent to the safety of its customers, had no financial incentive to ensure that the slide was safe, and exercised "a manifestly smaller amount of watchfulness and circumspection than the circumstances require[d] of a person of ordinary prudence." *Id.* Accordingly, the evidence was sufficient to support the jury's finding of gross negligence.

e. *Punitive damages.* Toys R Us maintains that the award of $18 million in punitive damages is grossly excessive and violates due process.

Compensatory damages and punitive damages, although generally awarded at the same time and by the same fact finder, serve different purposes. *Cooper Indus., Inc.* v. *Leatherman*

*Tool Group, Inc.*, 532 U.S. 424, 432 (2001). Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Id.* "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 416 (2003) (*State Farm*), citing *Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc., supra.*

Under Massachusetts law, punitive damages may be awarded only where authorized by statute. *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 856 n.20 (1983), citing *Boott Mills* v. *Boston & Me. R.R.*, 218 Mass. 582, 589 (1914). The Massachusetts wrongful death statute permits an award of punitive damages where the decedent's death was caused by the "malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant."[19] G. L. c. 229, § 2. The statute sets a minimum award of $5,000, but does not set a maximum award. *Id.* We have stated that the purposes of punitive damages include "condemnation and deterrence," *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 17 (1998), quoting *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997), and that a "proper punitive damage award" is one that is "sufficient . . . to send a clear message to the [defendant] of condemnation for its reprehensible behavior . . . ." *Clifton* v. *Massachusetts Bay Transp. Auth.*, 445 Mass. 611, 624 (2005). See Zabin & Connolly, The New Wrongful Death Act in Massachusetts Steps into the Twentieth Century, 58 Mass. L.Q. 345, 369 (1973-1974) ("punitive damages . . . are awarded . . . to punish the defendant and make an example of him").

The due process clause of the Fourteenth Amendment to the United States Constitution, however, prohibits the imposition of

---

[19]As one commentator has noted, statutes of this kind are grounded in a "very simple" legal philosophy: "all human life is precious, and . . . there is nothing wrong with making it very expensive to kill people." Hare, The Rationale of Damages for the Death of a Minor or Other Dependent Person, 41 B.U. L. Rev. 336, 339 (1961), citing *Western & Atl. Ry. Co.* v. *Michael*, 175 Ga. 1, 12 (1932). Punitive damages for wrongful death serve "to suppress and punish negligent acts causing death . . . [and] to stimulate diligence in protection of the natural right to live . . . ." Hare, *supra* at 341, quoting *Breed* v. *Atlanta, B. & C.R. Co.*, 241 Ala. 640, 642 (1941).

a " 'grossly excessive' punishment" on a tortfeasor. *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 562 (1996) (*BMW*), quoting *TXO Prod. Corp.* v. *Alliance Resources Corp.*, 509 U.S. 443, 454 (1993), and cases cited. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW*, *supra* at 574. "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm*, *supra* at 417, citing *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 42 (1991) (O'Connor, J., dissenting). See *Rhodes* v. *AIG Dom. Claims, Inc.*, 461 Mass. 486, 503 (2012), quoting *State Farm*, *supra* at 417.

Thus, "[c]ommon law and constitutional principles mandate that courts review the [amount of a punitive award] to ensure that it is reasonable and not simply a criminal penalty." *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 826 (1997), citing *Pacific Mut. Life Ins. Co.* v. *Haslip*, *supra* at 15, and *Honda Motor Co.* v. *Oberg*, 512 U.S. 415, 420-426 (1994). Because "the award of punitive damages cannot be left to the unguided discretion of the jury," *Bain* v. *Springfield*, *supra* at 769, "[w]here, as here, there is no cap on punitive damages, a judge or an appellate court must scrutinize the relationship between actual damages and the award of punitive damages." *Labonte* v. *Hutchins & Wheeler*, *supra* at 827, citing *Browning-Ferris Indus. of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U.S. 257, 281 (1989) (Brennan, J., concurring). See *Pacific Mut. Life Ins. Co.* v. *Haslip*, *supra* at 18 ("unlimited jury discretion . . . in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities").

At the same time, "we do not substitute our judgment for that of the jury." *Dartt* v. *Browning-Ferris Indus., Inc (Mass.)*, *supra* at 17a. "[I]t is the jury's function to make the difficult and uniquely human judgments that defy codification and that 'buil[d] discretion, equity, and flexibility into a legal system.' " *McCleskey* v. *Kemp*, 481 U.S. 279, 311 (1987), quoting H. Kalven & H. Zeisel, The American Jury 498 (1966). See *Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc.*, *supra* ("A jury's

assessment . . . of punitive damages is an expression of its moral condemnation"). Our role, therefore, is not to review the wisdom of the jury's award of punitive damages. It is instead only to determine whether the award exceeds constitutional bounds. See *BMW, supra* at 568 ("Only when an award can fairly be categorized as 'grossly excessive' in relation to [the state's interests in punishment and deterrence] does it enter the zone of arbitrariness that violates the [d]ue [p]rocess [c]lause of the Fourteenth Amendment").

In *BMW, supra* at 575-576, 580-581, 583, the United States Supreme Court set forth three factors to consider in determining whether a punitive damages award is excessive: (1) "the degree of reprehensibility of the defendant's conduct," (2) the ratio of the punitive award to the "actual harm inflicted," and (3) a comparison of "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." See *Labonte* v. *Hutchins & Wheeler, supra* at 826-827 (adopting *BMW* factors). We consider each of these factors in turn.

i. *Degree of reprehensibility.* "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW, supra* at 575. "[E]xemplary damages imposed on a defendant should reflect 'the enormity of his offen[s]e.' " *Id.*, quoting *Day* v. *Woodworth*, 54 U.S. (13 How.) 363, 371 (1852).

The United States Supreme Court has "instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm, supra* at 419, citing *BMW, supra* at 576-577.

In this case, the harm caused was physical, and was so severe as to result in Robin's death.[20] As to the next factor, Toys R Us

---

[20]There also was evidence that Robin's death resulted in economic injury to her family, in the form of lost income and household services.

neglected to ensure that the slide conformed with applicable safety regulations before it sold the slide to customers, even when it knew or should have known, based on the instructions included with the slide and the warning label affixed thereon, that head-first use could result in serious if not catastrophic injury or death. Such conduct evinces an indifference to the safety of persons using products sold by Toys R Us. The third aggravating factor, whether the victim had financial vulnerability, is relevant where the defendant's conduct resulted in economic harm to the victim, see *BMW, supra* at 576; as the harm here was primarily noneconomic, we do not consider this factor in our analysis. As to the fourth factor, Toys R Us's conduct involved repeated actions, since it imported thousands of Banzai Falls In-Ground Pool Slides into the United States for sale. As to the fifth factor, per the jury's verdict, the harm was not the result of intentional malice, trickery, or deceit, but only of gross negligence. See *Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 512 (2008) (gross negligence is "the least blameworthy conduct triggering punitive liability").

In assessing these factors, we conclude that the circumstances of this case exhibit a substantial degree of reprehensibility. Although only grossly negligent, rather than malicious or wilful, Toys R Us's conduct nonetheless caused grievous physical harm, evinced an indifference to the safety of others, and involved repeated actions.

ii. *Ratio of punitive award to actual harm inflicted.* "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW, supra* at 580, citing *TXO Prod. Corp.* v. *Alliance Resources Corp., supra* at 459, and *Pacific Mut. Life Ins. Co.* v. *Haslip, supra* at 23. Notwithstanding its reliance on this factor, the United States Supreme Court has declined repeatedly to impose a constitutionally permissible ratio that punitive damages awards may not exceed. *State Farm, supra* at 425. See *Pacific Mut. Life Ins. Co.* v. *Haslip, supra* at 18 ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit

every case").[21] However, the Court has provided some guidance, stating that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm, supra.* "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 or . . . 145 to 1" (citation omitted). *Id.*

Additionally, the Court has indicated to some extent when a lesser or greater ratio may be warranted. Where compensatory damages are "substantial," "a lesser ratio, perhaps only equal to compensatory damages," may reach the constitutional limit. *Id.* On the other hand, a higher ratio may be appropriate where, as here, "the monetary value of noneconomic harm might have been difficult to determine." *BMW, supra* at 582.

In *Pacific Mut. Life Ins. Co.* v. *Haslip, supra* at 6, where the harm to the plaintiff was purely economic, the Court noted that a ratio of punitive to compensatory damages of more than four to one "may be close to the line" but, in that case, did not "cross the line into the area of constitutional impropriety." *Id.* at 23-24. In *State Farm, supra* at 426, where the harm was primarily noneconomic (intentional infliction of emotional distress accompanied by "minor economic injuries"), the Court concluded that a ratio of one hundred forty-five to one was excessive, and remanded the case to the Utah Supreme Court for reconsideration. *Id.* at 426, 429. The Utah Supreme Court reduced the award of punitive damages so that the ratio of punitive to compensatory damages was nine to one, see *Campbell* v. *State Farm Mut. Auto. Ins. Co.,* 98 P.3d 409, 420 (Utah 2004), and the defendant's subsequent petition for certiorari was denied. See *State Farm Mut. Auto. Ins. Co.* v. *Campbell,* 543 U.S. 874 (2004). Courts in other jurisdictions, reviewing awards

---

[21]In *Exxon Shipping Co.* v. *Baker,* 554 U.S. 471, 513 (2008), the United States Supreme Court held that, in Federal maritime cases, the ratio of punitive to compensatory damages should not exceed one to one. That holding is not applicable here and does not alter the Court's jurisprudence in the area of due process review of punitive damages, as the Court reviewed the award of punitive damages in that case only "in the exercise of [its] [F]ederal maritime common law authority," and not "for conformity with . . . the outer limit allowed by due process." *Id.* at 502.

in personal injury or wrongful death actions, have entered or upheld punitive awards representing comparable single-digit or low double-digit ratios of punitive to compensatory damages. See, e.g., *Union Pac. R.R. Co.* v. *Barber*, 356 Ark. 268, 303, cert. denied, 543 U.S. 940 (2004) (personal injury case; $25 million in punitive damages and $5.1 million in compensatory damages; ratio of five to one); *Boeken* v. *Philip Morris Inc.*, 127 Cal. App. 4th 1640, 1649, 1696, 1703 (2005), cert. denied, 547 U.S. 1018 (2006) (personal injury and products liability case; $50 million in punitive damages and $5,539,127 in compensatory damages; ratio of nine to one); *CSX Transp., Inc.* v. *Palank*, 743 So. 2d 556, 558 (Fla. App. Ct. 1999), cert. denied, 531 U.S. 822 (2000) (wrongful death case; $50 million in punitive damages and $6.14 million in compensatory damages; ratio of eight to one); *Grassie* v. *Roswell Hosp. Corp.*, 258 P.3d 1075, 1089 (N.M. Ct. App. 2010) (wrongful death case; $10 million in punitive damages and $993,465 in compensatory damages; ratio of just over ten to one); *Flax* v. *DaimlerChrysler Corp.*, 272 S.W.3d 521, 538-539 (Tenn. 2008) (wrongful death and products liability case; $13,367,345 in punitive damages and $2.5 million in compensatory damages; ratio of 5.35 to one).

Here, the jury awarded $18 million in punitive damages and $2,640,000 in compensatory damages, a ratio of slightly less than seven to one. Because the award is within the single digit range, and the harm is primarily noneconomic, the award does not, on its face, appear grossly excessive in light of the accompanying compensatory damages. Compare *Flax* v. *Daimler-Chrysler Corp.*, *supra*, and *Boeken* v. *Philip Morris Inc.*, *supra*, with *State Farm*, *supra* at 426 (ratio of one hundred forty-five to one), and *BMW*, *supra* at 583, quoting *TXO Prod. Corp.* v. *Alliance Resources Corp.*, *supra* at 481 (O'Connor, J., dissenting) ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. When the ratio is a breathtaking [five hundred to one], however, the award must surely 'raise a suspicious judicial eyebrow' ").

Toys R Us argues that a lesser ratio is appropriate in this case because the award of compensatory damages is substantial. See

*State Farm, supra* at 425. While $2,640,000 may be a substantial
sum of money by many measures, its significance pales when
viewed not as compensation for economic loss or emotional
distress but for the loss of a young woman's life. Compare *Flax*
v. *DaimlerChrysler Corp., supra* at 539 (in wrongful death
action, "we do not believe that an award of $2,500,000 is so
large as to require a ratio of [one] to [one]"), with *State Farm,
supra* at 426 (compensatory award substantial where plaintiffs
"were awarded $1 million for a year and a half of emotional
distress"). Further, even if we were to agree with Toys R Us
that the ratio of punitive to compensatory damages is high, the
monetary value of the injury in a wrongful death action is
undoubtedly "difficult to determine." See *BMW, supra* at 582.
Accordingly, the amount of compensatory damages awarded
should not be the sole consideration in assessing the ratio of
punitive damages to the "actual harm" inflicted, and a higher
ratio of punitive to compensatory damages is justifiable on this
basis. See *id.* Contrast *Pacific Mut. Life Ins. Co.* v. *Haslip,
supra.*

iii. *Comparison of punitive award to civil penalties.* "Compar-
ing the punitive damages award and the civil or criminal penal-
ties that could be imposed for comparable misconduct provides
a third indicium of excessiveness." *BMW, supra* at 583. "[A]
reviewing court engaged in determining whether an award of
punitive damages is excessive should 'accord "substantial defer-
ence" to legislative judgments concerning appropriate sanctions
for the conduct at issue.' " *Id.,* quoting *Browning-Ferris Indus.
of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U.S. 257, 301 (1989)
(O'Connor, J., concurring in part and dissenting in part).

Evidence before the jury would have permitted a finding, had
the question been before them, that Toys R Us imported and
distributed the Banzai Falls In-Ground Pool Slide in violation of
the requirements of § 1207. Therefore, the jury could have con-
cluded that Toys R Us engaged in acts prohibited by 15 U.S.C.
§ 2068(a)(1).[22],[23] Such conduct, when done "knowingly," triggers
civil penalties under 15 U.S.C. § 2069(a)(1). "Knowingly" is

---

[22]"It shall be unlawful for any person to . . . import into the United States
any consumer product which is not in conformity with an applicable consumer
product safety standard under this chapter." 15 U.S.C. § 2068(a)(1).

[23]Unless otherwise noted, all references to provisions in Title 15 of the

defined as including "the presumed having of knowledge deemed to be possessed by a reasonable man who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of representations." 15 U.S.C. § 2069(d).

There was no evidence before the jury indicating that Toys R Us had actual knowledge, at the relevant time, that the slide was subject to the requirements of § 1207. However, given the admission in evidence of a Federal regulation governing consumer pool slides, the jury would have been warranted in concluding that a reasonable retailer of consumer pool slides would have possessed such knowledge, and that such knowledge was obtainable upon the exercise of due care. See *Altman* v. *Aronson*, 231 Mass. 588, 591 (1919) (negligence is "the failure of a responsible person . . . to exercise that degree of care, vigilance and forethought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances"). Accordingly, Toys R Us's conduct in importing a slide that was not in compliance with Federal safety regulations qualifies as "knowing[]" for purposes of 15 U.S.C. § 2069(a)(1), and could have warranted civil penalties under that statute. See *Aimone* v. *Walgreen's Co.*, 601 F. Supp. 507, 513 (N.D. Ill. 1985) ("knowingly," as used in 15 U.S.C. § 2069 (d), includes "disregard-[ing] reasonable safeguards . . . or act[ing] without knowledge ascertainable upon the exercise of due care").[24]

During the period when Toys R Us imported the Banzai Falls In-Ground Pool Slide, penalties under 15 U.S.C. § 2069(a)(1) were limited to $5,000 per violation, with a $1,250,000 maximum total penalty for any related series of violations. 15 U.S.C. § 2069(a)(1). Since evidence at trial indicated that Toys R Us imported approximately 4,000 Banzai Falls In-Ground Pool Slides, each one of which could have constituted a violation of § 1207, Toys R Us potentially could have been subject to

United States Code are to the version that existed prior to amendments in 2008. See Pub. L. No. 110-314, Title II, Subtitle B, §§ 216, 217(a)(1)(A)-(B), 122 Stat. 3058 (2008).

[24]Violations of 15 U.S.C. § 2068 may also trigger criminal penalties, but only where the prohibited conduct was both "knowing and willful." 15 U.S.C. § 2070. Here, there was no evidence that Toys R Us's conduct was wilful.

$1,250,000 in civil fines for the importation of the slide. In that event, the ratio of punitive damages to possible civil penalties would be $18 million to $1,250,000, or approximately fourteen to one.

This ratio may appear high. However, the United States Supreme Court has indicated that strict equivalence between punitive awards and possible civil penalties is not necessary in order for an award to meet constitutional requirements. See *Pacific Mut. Life Ins. Co.* v. *Haslip, supra* at 23 (approving punitive award "much in excess of the fine that could be imposed"). Courts from other jurisdictions, in applying the *BMW* analysis, have approved awards with higher ratios of punitive damages to possible civil penalties than the one present here. See *Leatherman Tool Group, Inc.* v. *Cooper Indus., Inc.*, 285 F.3d 1146, 1148-1149 (9th Cir. 2002), quoting *Cooper Indus., Inc.* v. *Leatherman Tool Group, Inc.*, 532 U.S. 424, 442-443 (2001) ($500,000 award; $25,000 maximum civil penalty; ratio of twenty to one); *BMW of N. Am., Inc.* v. *Gore*, 701 So. 2d 507, 514, 515 (Ala. 1997) ($50,000 punitive award permissible; $2,000 maximum civil penalty; ratio of twenty-five to one). Thus, while the award in this case may be high, it is not grossly excessive.[25]

In sum, Toys R Us's conduct, as found by the jury, evinced a substantial degree of reprehensibility. The ratio of punitive damages awarded to actual harm is within the single-digit range that generally accords with due process, see *State Farm, supra,* and a comparison of punitive damages to possible civil penalties suggests that the amount of the punitive damage award is not so excessive as to exceed constitutional bounds. The jury's award of punitive damages in this case, while perhaps higher than many such awards, cannot "fairly be categorized as 'grossly excessive' " in relation to the Commonwealth's legitimate

[25]Further, we note that, in 2008, Congress amended 15 U.S.C. § 2069(a)(1), to allow for penalties of up to $100,000 per violation, with a maximum total penalty of $15,000,000 for any related series of violations. Consumer Product Safety Improvement Act of 2008, Pub. L. No. 110-314, Title II, Subtitle B, §§ 216-217, 122 Stat. 3016 (2008). Although these revised maximums were not in place at the time of Toys R Us's negligent conduct, their enactment soon thereafter suggests that an $18 million award is not a grossly disproportionate punishment for the conduct in question.

interests in condemnation and deterrence. See *BMW*, *supra* at 568; *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 17 (1998), quoting *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997). Therefore, the award does not enter the "zone of arbitrariness that violates the [d]ue [p]rocess [c]lause of the Fourteenth Amendment." See *BMW*, *supra*.

*Judgment affirmed.*