WALTER DUVAL *vs.* WILLIAM DUVAL.

Worcester.    September 23, 1940. — December 11, 1940.

Present: FIELD, C.J., LUMMUS, QUA, COX, & RONAN, JJ.

*Negligence*, Gross, Motor vehicle.

A finding of gross negligence of the operator of an automobile was not
warranted by evidence that, as he approached a railroad grade cross-
ing down a hill on a very icy, slippery road at a speed of from thirty
to thirty-five miles an hour, signal lights which he knew were located
there were not flashing and he heard no whistle nor bell; and that he
relied on the signal lights and did not see an approaching train until
he was about fifty feet from the tracks, when he applied the brakes and
the automobile skidded into the train.

TORT.    Writ in the District Court of Fitchburg dated
December 31, 1935.

Upon removal to the Superior Court, a verdict for the
plaintiff in the sum of $4,500 was recorded at the trial before
*Leary*, J.

*C. C. Milton*, (*R. C. Milton* with him,) for the defendant.
*A. A. Gelinas*, (*J. D. Ward* with him,) for the plaintiff.

COX, J.    The only question in this case is whether it was
error for the trial judge, after a verdict for the plaintiff,
to deny, on leave reserved, the defendant's motion for a
verdict on a count alleging the gross negligence of the de-
fendant.    The case was tried in part with others and the
jury took a view.

Facts not in dispute are that the plaintiff, at the time of
his injuries, was riding as a guest, so called, of the defend-
ant, his brother, in an automobile owned and operated by
the latter, which collided with a locomotive engine at a
grade crossing in this Commonwealth, at about five o'clock
in the morning of December 2, 1935.    The highway, on which
they were travelling in a westerly direction, as it approaches
the railroad crossing has a down grade of from five to six
per cent to a point about four or five hundred feet from the
crossing, and from there to the crossing the down grade is

about three per cent. It was raining, or misting, and was very icy and very slippery. The defendant's automobile was not equipped with chains. To the north of the crossing in question are two other grade crossings at distances of two hundred and six hundred yards respectively. There are no gates at the crossing in question, but there are signal lights on either side that are designed to flash red on the approach of a train. The lights on the easterly side are twelve feet from the nearer rail. It was dark at the time of the collision, and the train involved was a freight.

The jury could have found that at a point from sixteen hundred to two thousand feet from the crossing, when the automobile was travelling at a speed of between thirty-five and forty miles per hour, the plaintiff said to his brother: "Take it easy. You're going too fast. The road's slippery." From that point on, as it was approaching a filling station, for a distance of from eight hundred to one thousand feet the automobile did not slow down at all. The plaintiff had no recollection of what occurred after they passed this filling station, but he testified that at that point the speed of the automobile was about thirty-five miles an hour, and that he did not say anything to his brother. He also testified that, when he was at the filling station, he did not remember seeing any lights "although he looked ahead. He knew there was a crossing there, and he looked for the lights. He didn't know that they were not flashing, but he didn't see them flashing. He knew where the lights were supposed to be and he looked to see if they were flashing, but they weren't that he could see." From the filling station on, the speed of the automobile was variously estimated as from twenty to thirty-five miles an hour. The defendant knew that he was approaching a railroad crossing and that "blinker" lights were there. His automobile began to skid when it was about fifty to seventy feet from the crossing. There was evidence that the automobile slurred or slewed from one side to the other when the brakes were applied, "skidding and apparently trying to stop," and that it skidded to the train. The plaintiff, who could have been found to remember nothing after the au-

tomobile passed the filling station, testified that the automobile did not skid at all during the journey, and there was no evidence that it did skid prior to immediately before the collision. Its left side came in contact with the engine. There was evidence that the crossing red lights were designed to function when the train was about three hundred yards distant, and that these lights are observable from a point about three hundred feet to the east of the crossing. But there was no evidence from any of the five travellers on the highway who were approaching the crossing, or from other witnesses, that they saw the lights flashing before the defendant's automobile began to skid. Apart from this evidence, there was none that the lights were flashing. All of the witnesses who were in the vicinity at the time of the collision testified that they did not hear any warning whistles or bells, and there was no evidence that they were sounded. All of the witnesses who were inquired of as to the point testified that they heard no noise of the train. There was evidence that the front windows in the defendant's automobile on either side were partly opened, and the plaintiff testified that the windshield was clear, and that there was no mist on it. The defendant testified that he was depending on the blinker lights to warn him of the approach of the train; that he was watching the road and looking straight ahead; that the lights were not working; that he did not look for a train; that when he was one hundred feet from the crossing, he did not look to his right or left; that the first thing he saw of the train was the light of the engine when he was about fifty-eight feet from the crossing; and that he then applied his brakes and his automobile skidded.

A civil engineer, whose plan of the locus was in evidence, testified that as one proceeds from the filling station toward the crossing, going west, the railroad track cannot be seen on either side of the crossing because of houses and trees and a slight bank down to the road; and that, at a point fifty feet east of the easterly rail as one is so approaching, none of the track on either side can be seen. He also testified that he had never noticed and could not say whether

one could see "across the railroad as you look between" the house that is fifty-eight feet from the crossing and the next house to the east, on the northerly side of the road. The plaintiff testified that he knew where the train passed the Smith house (fifty-eight feet from the crossing) and that "he knew that he couldn't see up the track as you approached it going west." There was evidence that when the automobile was about opposite the Smith house, the beam or rays of the headlight on the locomotive were seen. The plaintiff testified that, after he spoke to his brother about slowing down, he did not recall saying anything else to him. There was evidence that the plaintiff said nothing after passing the filling station, and there was no evidence to the contrary. There was evidence that the automobile lights were on, that it had good brakes, and that the windshield wiper was working; and there was no evidence to the contrary.

The witnesses testified that they heard no noise of any train until it reached the crossing. There was other testimony that the automobile began to skid when the brakes were applied, and a third occupant of the defendant's automobile testified, "We tried to cross the road . . . run off the road . . . not go on the rails . . . ." For the purpose of presenting a more intelligible view of the case, reference has been made to some of the evidence which the jury was not required to accept as true. Much of this evidence is recited together with the observation that there was no evidence to the contrary, that is, that even if disbelieved there is no evidence to establish any facts to the contrary. The case is decided, however, upon the facts most favorable to the plaintiff which the jury could have found from the evidence.

When the court in *Altman* v. *Aronson*, 231 Mass. 588, defined gross negligence, it added, by way of caution, that the definition did not possess the exactness of a mathematical demonstration; that it was what the law then afforded (1919), was the result of our own decisions, and was supported by the great weight of authority in other jurisdictions. In that case the question was as to the duty

of a gratuitous bailee of goods. In the case at bar it again becomes necessary for the court to apply the definition to the conduct of one in whose charge was the personal safety of a human being. The rule, however, is the same as in the case of the bailment of a chattel, although it is conceivably easier to apply the rule in the former case, where the mind cannot possibly be disturbed by any thought of human suffering and injury, than in the latter. At best, it is often exceedingly difficult to draw the line of distinction that exists between gross negligence and ordinary negligence. "Yet the distinction is well established and must be observed, lest all negligence be gradually absorbed into the classification of gross negligence." *Quinlivan* v. *Taylor,* 298 Mass. 138, 140.

It comes down to the proposition that each case must be decided according to its peculiar features, although a fact finding tribunal is not required to pass separately upon the various elements that enter into a defendant's conduct. On the contrary, that conduct is to be considered as a whole, and in each case it becomes a question of determining whether a finding is warranted of that high degree of culpability and indifference to duty that is the essential characteristic of gross negligence. *Beaton* v. *Dawson,* 303 Mass. 429, 432. *Bruno* v. *Donahue,* 305 Mass. 30, 35–36.

We think it could not be said that the conduct of the defendant, in operating his automobile up to the time when he was within sixty or seventy feet of the railroad crossing, was grossly negligent. It does not appear that up to that point there had been any skidding of the automobile, and there is no suggestion in the evidence that it was not at all times within the proper control of the defendant. It is true that at one time the plaintiff had asked him to slow down and that he did not, but there is nothing from which it could be found that the plaintiff made any further complaint in any respect as to the operation of the automobile.

But it is said that the final approach to the grade crossing, taken in connection with what the defendant did or did not do, together with what he had been doing thereto-

fore, warrants a conclusion that he was grossly negligent within the rule. In *Adamian* v. *Messerlian*, 292 Mass. 275, the streets were particularly slippery and icy because of rain or mist freezing on the ground. The defendant was descending a hill at a speed of from forty-five to fifty miles an hour. He had no chains. The occupants of the automobile had protested as to the speed. The automobile began to skid. The defendant lost control of it at the top of the hill and it continued to skid over the road for a distance of nine hundred eighty feet and then crashed into a tree on the right-hand side of the road. Yet it was held in an opinion by Rugg, C.J., who wrote the definition of gross negligence in *Altman* v. *Aronson*, that all these factors did not warrant a finding of gross negligence. See *Lonergan* v. *American Railway Express Co.* 250 Mass. 30, 35; *McKenna* v. *Smith*, 275 Mass. 149; *Lynch* v. *Springfield Safe Deposit & Trust Co.* 294 Mass. 170; *Kohutynski* v. *Kohutynski*, 296 Mass. 74; *Quinlivan* v. *Taylor*, 298 Mass. 138; *Hebert* v. *Hicks*, 299 Mass. 538.

Two statutes, at least, in this Commonwealth deal specifically with the conduct of a person operating a motor vehicle upon approaching a railroad crossing at grade. G. L. (Ter. Ed.) c. 90, § 15, as amended (see St. 1933, c. 26, § 1), provides, in part, that such person shall reduce the speed of the vehicle to a reasonable and proper rate, and shall proceed cautiously over the crossing. Violation of this provision is punishable by fine. G. L. (Ter. Ed.) c. 160, § 232, provides, so far as material, that, if a person is injured by collision with a train at a public grade crossing, and it appears that the signals required by statute were not given and that such neglect contributed to the injury, the railroad corporation shall be liable for damages or to a fine unless it is shown that, "in addition to a mere want of ordinary care, the person injured or the person who had charge of his person or property was, at the time of the collision, guilty of gross or wilful negligence, or was acting in violation of the law, and that such gross or wilful negligence or unlawful act contributed to the injury." The first statute referred to relates directly to the conduct of

the defendant and a violation of it is a "violation of the law" within the meaning of said § 232. *Kenney* v. *Boston & Maine Railroad,* 301 Mass. 271, 275–277. But in this connection "gross or wilful negligence" and "acting in violation of the law" are not the same thing, although it is conceivable that the unlawful act may be of such a character as to amount to gross or wilful negligence. *Klegerman* v. *New York, New Haven & Hartford Railroad,* 290 Mass. 268, 274.

We assume that it could have been found that the provisions of § 15 of said c. 90 were violated by the defendant and that this violation contributed to the plaintiff's injury. But would this, together with the other factors, amount to gross negligence? It is undisputed that the defendant was familiar with the crossing, and he knew that it was supposed to be protected by blinker lights. G. L. (Ter. Ed.) c. 160, § 138, requires every railroad corporation to give signals by whistle or bell at a distance of at least eighty rods from a public grade crossing, and that the signals shall continue until the engine has crossed the way. The defendant could rely to some extent upon the expectation that the railroad corporation and its employees would do their duty, but he, too, was required actually to exercise his own faculties of sight, hearing and common sense to care for himself and those who were riding with him. *Morrissey* v. *Boston & Maine Railroad,* 216 Mass. 5. See *Slattery* v. *New York, New Haven & Hartford Railroad,* 203 Mass. 453, 456; *Lundergan* v. *New York Central & Hudson River Railroad,* 203 Mass. 460, 463, 464; *Murphy* v. *Boston Elevated Railway,* 204 Mass. 229, 232; *Sullivan* v. *New York, New Haven & Hartford Railroad,* 154 Mass. 524, 528; *Fortune* v. *New York, New Haven & Hartford Railroad,* 271 Mass. 101, 104, 105; *Eisenhauer* v. *Boston & Maine Railroad,* 285 Mass. 439; *Gove* v. *Boston & Maine Railroad,* *ante,* 84, 86. The violation of § 15 of said c. 90 involves, as in the violation of other penal statutes, something more than the absence of due care in the sense that if there is a violation of it contributing to one's injury, he may not recover. *Gaboriault* v. *New York, New Haven &*

*Hartford Railroad,* 289 Mass. 36, 42. *Anderson* v. *Boston &
Maine Railroad,* 302 Mass. 101, 103.

We think it cannot be said that the conduct of the defendant amounted to gross negligence. It could have been found that the speed at which the defendant's automobile was travelling was in violation of law, but there is nothing in the evidence to show that it affected its safe operation until just before the collision. The immediate consequences of the speed of the automobile appear to have been that the defendant was unable to control it with the result that, after an attempt to do so, it travelled over a comparatively short distance on an icy surfaced street until it collided with the train. The defendant was a lawful traveller upon the highway, and as such had certain reciprocal rights and obligations, including that of observing the provisions of said § 15 of c. 90, and he owed the plaintiff the duty to refrain from gross negligence. But, as was said in *Lynch* v. *Springfield Safe Deposit & Trust Co.* 294 Mass. 170, at page 172: "There is no evidence of deliberate inattention, or of voluntary incurring of obvious risk, or of impatience of reasonable restraint, or of persistence in a palpably negligent course of conduct over an appreciable period of time." There was not the deliberate inattention that was held to warrant a finding of gross negligence in *Koufman* v. *Feinberg,* 298 Mass. 270. See cases cited at page 271. There was not that indifference to present legal duty and "utter forgetfulness of legal obligations" referred to in *Folan* v. *Price,* 293 Mass. 76, 79, and cases cited. Nor was there that reckless disregard of a plain duty to the public as in *Parker* v. *Moody,* 274 Mass. 100, nor do we think that there was "the omission of even such diligence as habitually inattentive and careless men do not fail to exercise in avoiding danger to their own person or property." *Altman* v. *Aronson,* 231 Mass. 588, 593. *Bruno* v. *Donahue,* 305 Mass. 30.

*Exceptions sustained.*
*Judgment for the defendant.*