BOSTON & MAINE RAILROAD,
Plaintiff, Appellant,

v.

The AETNA CASUALTY AND SURETY
COMPANY, Defendant, Appellee.

No. 6222.

United States Court of Appeals
First Circuit.

March 31, 1964.

Lawrence R. Cohen, Boston, Mass., with whom Newton H. Levee, Boston, Mass., was on brief, for appellant.

Richard Wait, Boston, Mass., for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts, entered September 30, 1963, after a trial before the court sitting without a jury, dismissing a complaint filed by plaintiff-appellant, Boston & Maine Railroad, which sought recovery on a Railroad Blanket Bond issued by defendant-appellee, Aetna Casualty and Surety Company. The case was tried to the court below upon the basis of a pre-trial stipulation, seven documentary exhibits, and portions of the deposition of one John D. O'Connor.

On July 1, 1959 Aetna executed and delivered to the Boston & Maine Railroad a Railroad Blanket Bond under the terms of which Aetna agreed to indemnify Boston and Maine up to $100,000 "against any loss * * * for which the Insured is legally liable * * * through Culpable Negligence as defined in Section 4 on the part of, any one or more of the Employees. * * *" Section 4, which is entitled "Definition of Culpable Negligence," reads as follows:

> "The words Culpable Negligence, as used in this bond, mean only gross carelessness in the performance or omission of duties, or the deliberate assumption of risk by an Employee in violation of printed or written instructions, rules or regulations of the Insured; but this bond shall not cover (a) any loss through mistake or error of judgment in the exercise of discretion vested in an Employee, or (b) any loss on account of injury to or death of any person or persons or damage to or destruction of property or (c) any loss through the failure properly to classify or compute freight or other charges."

The sole question presented is whether the loss which occurred to the plaintiff in the fashion hereinafter set forth was through the culpable negligence of O'Connor, an "Employee" of B & M under the provisions of a 1948 joint facility agreement entered into between the New Haven Railroad and B & M.

The joint facility agreement permitted the plaintiff to make use of a joint freight facility at Worcester, Massachusetts, maintained by the New Haven. The agreement provided that the facility be manned and actually operated by employees of the New Haven with costs of the facility allocated according to a formula spelled out in the contract.

During the period 1958 to 1960, the freight agent at the joint facility was O'Connor, a New Haven employee for over twenty years. His duties included general supervision of the freight house and freight office, seeing to it that freight was handled properly, that freight cars were properly placed, and that freight was delivered to consignees pursuant to the terms of applicable shipping documents.

One of the concerns to which freight was regularly shipped over the B & M was the Gardner Beef Company. Gardner had its own siding near the freight facility. All shipments to Gardner were on order-notify bills of lading which provided for payment under the bill of lading prior to the release of any car to Gardner. Gardner, however, had posted a delivery bond in the amount of $125,000. Under this bond it was permissible for the freight agents to release cars shipped on order-notify bills of lading without taking up the bill of lading at the time of placement on the siding, subject to two conditions: (1) that the aggregate value of shipments so placed should at no time exceed $125,000, (2) that each bill of lading should be surrendered within five days. The provision in Rule 7 of the Uniform Freight Classification made the bond inoperative if the railroad violated either of these two conditions.

In a letter dated August 19, 1958, from one J. E. Hines of the B & M Credit Bureau, O'Connor was advised that Gardner was not complying with the five-day requirement on the surrender of bills of lading, and O'Connor was instructed to

"police this transaction very carefully." On October 22, 1958, by a letter from H. S. Harriman, Assistant Auditor of Revenue, B & M, O'Connor was again advised that the handling of shipments traveling to Gardner on order-notify bills of lading was "very unsatisfactory."

O'Connor "shut off" Gardner from receiving any additional freight in 1958 upon receipt of the letter from Hines, at which time unpaid-for shipments actually delivered to Gardner had reached a total of $195,000. After Gardner made appropriate payments, deliveries were resumed. Following receipt of the Harriman letter, O'Connor (who previous thereto had delegated to his assistants the responsibility for keeping track of the Gardner account) decided to personally police the account and thereafter he maintained a record book in which he entered the number of the car, the value of the car, and the date it was placed on Gardner's siding. From time to time O'Connor "shut off" Gardner whenever the aggregate of unpaid freight exceeded or closely approached the sum of $125,000. Each time that this happened deliveries to Gardner were halted until it brought itself within the conditions of the bond. O'Connor testified that this went on "pretty steadily" and that he would find out "probably every week or two weeks" that Gardner had failed to comply with the conditions of the bond, at which time he would "shut them off" until Gardner complied.

In September 1960, O'Connor discovered that with reference to Gardner "things were getting worse" and that it owed approximately $135,000. On September 6, O'Connor went to Isadore and Joseph Solomon, the two executives who operated Gardner Beef, told them that they were over their bond, and advised them that he "wasn't going to have anything more to do with them until such time as they got down and wanted to operate the way they were supposed to operate." After this meeting O'Connor returned to his office and called William Wedge who, according to the stipulation, was plaintiff's Regional Sales Manager in charge of freight traffic sales work for the Worcester, Fitchburg and Holyoke areas.

The introduction into evidence of that part of O'Connor's deposition containing the telephone conversation with Wedge was objected to at the trial on the ground of hearsay. The lower court correctly allowed the conversation for the limited purpose of showing O'Connor's state of mind and the condition upon which he acted subsequent to the telephone call. VI Wigmore on Evidence § 1729 (3d ed. 1940). Counsel stipulated that if O'Connor appeared at the trial as a witness he "would testify as he has done so in this deposition and what he said is the truth to the extent it is admissible." O'Connor's testimony thus continues:

"Q. You called up Wedge. A. The reason I called him was because of my shutting off this concern would result in the loss of traffic to the Boston & Maine Railroad, and I thought he should know, and I was also pretty sure that if I notified him, he would also notify his people in Boston, and he told me that he was glad that I had called, because he said, 'I will call Mr. McGinnis and tell him that Solomon is coming in to see him.' The next night, about 20 minutes of 7, I got a call at home from Wedge, from Holyoke, and he said, 'John, I just got through talking to Mr. McGinnis, and he wants to keep these people in business until such time as he can straighten them out,' and I says, 'You can't do that,' and he says, 'Well, it is out of your hands now. It is strictly my responsibility and you keep me informed so I can, in turn, keep Mr. McGinnis informed.'

\* \* \* \* \* \*

"Q. Now, after Wedge had told you that, what did you do, with reference to cars?

\* \* \* \* \* \*

"A. Wedge told me that it was strictly his responsibility, and he

says, 'You release these cars, and, in fact, right now, you give them three cars.'

"Q. Did you? A. I said, 'You know he is up to $135,000.' He says, 'That has nothing to do with it,' so I released the three cars.

\* \* \* \* \* \*"

Thereafter, O'Connor made no attempt to keep Gardner in compliance with the terms of the $125,000 bond but he did continue to keep his running record of deliveries to and payments by Gardner and reported the status of the Gardner account to Wedge by telephoning him in Holyoke about once a week. This condition continued until about November 7, 1960, when according to O'Connor 'things blew up,' i. e., Gardner Beef Company went into bankruptcy at this time owing order-notify shippers of meat via B & M a sum in excess of $160,000. By March 6, 1961, B & M had made restitution to these shippers in an aggregate amount of over $130,000 and had conceded liability of $31,000 to one additional unpaid shipper. It then sought reimbursement from Aetna to the extent of the face of the Railroad Blanket Bond on the theory that O'Connor, in acting as he did, committed culpable negligence as defined in the Bond.

Culpable negligence, as defined in the Bond, includes two types of prohibited action. The first is "gross carelessness in the performance or omission of duties," and the second is "deliberate assumption of risks by an Employee in violation of printed or written instructions. \* \* \*" To recover under the Bond, plaintiff must establish that O'Connor's conduct fell within the prohibited types of action.

"Gross carelessness" is not a term common to the Massachusetts law and we have been unable to find a Massachusetts case defining its boundaries. That the term goes beyond the mere failure to use due care is obvious, but the extent of the proscribed inattentiveness is, so far, without description. Gross negligence, however, is a well-established concept in Massachusetts law. It was defined in Altman v. Aronson, 231 Mass. 588, 591, 121 N.E. 505, 506, 4 A.L.R. 1185 (1919) as

"substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. \* \* \* It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence."

In Bagley v. Burkholder, 337 Mass. 246, 149 N.E.2d 143 (1958), it was held that to establish gross negligence the defendant's conduct must amount to an "aggravated degree of culpability," and in Duval v. Duval, 307 Mass. 524, 30 N.E.2d 543, 546 (1940) a "high degree of culpability and indifference to duty" was deemed necessary. See also Pruzynski v. Malinowski, 338 Mass. 58, 153 N.E.2d 640 (1958); Massaletti v. Fitzroy, 228 Mass. 487, 118 N.E. 168, L.R.A.1918C, 264 (1917).

■■ Although "gross carelessness" is not necessarily synonymous with gross negligence, it seems to us that it goes as far as the latter in terms of the degree of departure from the standard of "reasonable care." It implies an indifference to consequences, a disregard of the cautions which would prevent a reasonable man from taking a specific course of action. The word "gross" is more than an epithet and adds to "carelessness" the concept of "out of all measure" or "beyond allowance." See State Board of Dental Examiners v. Savelle, 90 Colo. 177, 8 P.2d 693, 82 A.L.R. 1176 (1932).

Following receipt of the letters from Hines and Harriman, O'Connor took personal charge of the Gardner account and sought to keep Gardner within the terms of its bond. On September 6, he spoke

to the Solomons and warned them that unless they operated correctly he would "not have anything more to do with them." He was determined to discontinue delivery of cars to Gardner and felt obligated to telephone Wedge so that the B & M would know what was happening. But Wedge, who said he was speaking on behalf of McGinnis, the president of B & M, telephoned O'Connor the following evening and brushed aside O'Connor's protests that the cars should not be released. Wedge said that he had just finished talking to McGinnis, who wanted to keep the Solomons in business. O'Connor was told that the matter was "out of your hands now" and "strictly my responsibility." He was told to keep Wedge informed so that he, in turn, could keep McGinnis informed. In response to O'Connor's complaint that Gardner was up to $135,000, Wedge replied "That has nothing to do with it," and O'Connor was ordered to release the cars.

■ "Gross carelessness" is not made out by these facts. The release of the cars was a breach of contract between the B & M and the shippers, and an unwarranted exercise of discretion by McGinnis, but it did not constitute "gross carelessness" on the part of O'Connor. O'Connor took stringent precautions to keep Gardner in line but believed he was overruled by higher authority. Even if he could be said to be less than thorough in taking Wedge's word for what McGinnis had said, it could not be said that it was grossly careless, or that O'Connor's actions reflected an indifference to consequences. On the contrary, he repeatedly inferred the consequences to Wedge, but his pleas of "You can't do that" went unheeded. The Bond was not designed to protect B & M against its employees doing what they honestly believed the president had told them to do.

■ Nor could O'Connor's action be considered a "deliberate assumption of risk." "Deliberate" as used in the Bond indicates that the offending employee must be the actor. O'Connor's action was "deliberate" only in the sense that he knew what he was doing, but his actions were not the result of careful consideration on his part. He acted as he did because he was ordered to do so. The responsibility for releasing the cars, he was told, was to be Wedge's. O'Connor's participation continued after his protestations to Wedge because "I figured I had no right to cross Mr. McGinnis. He was the President. He was giving the orders."

Judgment will be entered affirming the judgment of the district court.