NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-114                                          Appeals Court

    MICHELLE WILLIAMSON-GREEN, administratrix,[1] vs.  EQUIPMENT 4
                        RENT, INC.


                        No. 15-P-114.

        Suffolk.     November 3, 2015. - March 3, 2016.

        Present:  Kafker, C.J., Vuono, & Hanlon, JJ.


Negligence, Gross negligence.  Damages, Punitive.  Practice,
     Civil, Directed verdict, Judgment notwithstanding verdict.



     Civil action commenced in the Superior Court Department on
April 24, 2009.

     The case was tried before Janet L. Sanders, J., and a
motion for a new trial or for remittitur was heard by her.


     Thomas F. Maffei (Margaret C. Kelty with him) for the
defendant.
     Joan A. Lukey for the plaintiff.

_____

     [1] Of the estate of James W. Williamson IV.  The plaintiff,
the decedent's wife, testified that she and her husband had
legally adopted each other's last names to create the hyphenated
last name of "Williamson-Green," but she added that they were
both still known professionally by their pre-marriage last
names.  As the operative complaint calls the decedent
"Williamson" -- a practice echoed in the parties' briefs -- we
adopt that usage.

KAFKER, C.J.    James Williamson was perched more than one hundred feet high on a boom lift, inspecting the roof of a university building in Boston, when the machine tipped over and crashed into a neighboring building, killing him.  The boom lift had been manufactured by Grove U.S., LLC (Grove), and rented from the defendant Equipment 4 Rent, Inc. (E4R).  Williamson's wife, Michelle Williamson-Green, as administratrix of Williamson's estate, successfully sued Grove and E4R for damages associated with her husband's wrongful death.  The jury found that negligence of Grove and of E4R each was "a direct and substantial factor in causing the death of Mr. Williamson."  The jury also found that "E4R's conduct [was] grossly negligent, wilful, wanton, or reckless."  The jury awarded $3,692,657.40 in compensatory damages against E4R and Grove, together with $5,900,000 in punitive damages solely against E4R.  The trial judge denied E4R's motions for a directed verdict and judgment notwithstanding the verdict,[2] judgment entered, and E4R appeals, claiming only that there was insufficient evidence to support the jury's award of punitive damages.[3]  We affirm.

---

[2] The judge also denied E4R's motion for a new trial or for remittitur.

[3] Grove did not appeal, as it settled with the plaintiff.

Background. In considering an appeal of "[t]he denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict[, we must review the record] under the same standard used by the trial judge[,] . . . constru[ing] the evidence in the light most favorable to the nonmoving party and disregard[ing] that favorable to the moving party." O'Brien v. Pearson, 449 Mass. 377, 383 (2007). See Christopher v. Father's Huddle Café, Inc., 57 Mass. App. Ct. 217, 219 (2003). "Our duty in this regard is to evaluate whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the [nonmovant].'" O'Brien, supra, quoting from Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 121 (1992). See Christopher, supra, citing Michnik-Zilberman v. Gordon's Liquor, Inc., 390 Mass. 6, 7 n.1 (1983). In light of this standard, we recite the general facts below as the jury could have found them, reserving some of the more specific facts for our detailed discussion of the different acts and omissions constituting evidence of E4R's gross negligence.

1. General overview of the boom lift. The boom lift in the instant case is a Model A125J articulating boom lift manufactured by Grove and owned by E4R, a construction equipment rental company. That model of boom lift is depicted in the appendix to this opinion. This "[a]erial work platform . . .

incorporate[s] multiple arm[ segments] that have articulating joints between them."  The first arm segment, called "the riser," was a key focus of this litigation.  Using hydraulics that tilt the riser, the angle of the riser can be elevated and lowered.  Because the riser is made up of several nested metal sections, the riser can also be extended (i.e., telescoped out) and retracted.[4]

Boom lift "manufacturers refer to the range of allowable working positions as the working envelope of the unit."  This lift's riser has a "working envelope" of seventy-two to seventy-four degrees above the horizontal.  Because this boom lift is very tall, extending as high as 125 feet, "the lift can become unstable and tip over" if two things coincide:  (1) the riser is in an extended position, and (2) the riser's angle (from the horizontal) is fifty-five degrees or less (about seventeen degrees below the working envelope).  A set of key boom lift safety features called the "riser interlock system" normally prohibits the lift operator from unsafely positioning the riser

---

[4] The lower end of the riser is attached to the wheeled base of the boom lift, and the upper end is attached to the second major arm segment, the boom.  At the upper end of the boom is a third small arm segment called the jib, and at the end of the jib is the railed platform where the lift operator and passenger stand.  Like the riser, the boom can be elevated and lowered, as well as extended in length and retracted.

in this fashion.[5]  Two integral components of the riser interlock system are (1) the "proximity sensors" and (2) the "riser retracted limit switch."

2.  <u>Summary of the accident</u>.  On February 7, 2009, Gregory Johnson, an employee of roofing contractor Reliable Roofing and Sheet Metal, LLC (Reliable Roofing),[6] was the operator of the boom lift, which Reliable Roofing had rented from E4R. Williamson, who worked for a different contractor involved in the roof repair job on the university dormitory building, was a passenger on the boom lift and was inspecting the roof.  After about two hours of operation, Johnson began lowering the boom lift's riser out of the working envelope while the riser was still extended -- an operation which should have been prohibited by the riser interlock system.  When the riser angle reached about fifty-five degrees, the lift tipped over, inflicting fatal injuries on Williamson.  As explained by one of Grove's experts:

> "Based on my observations of the videos[7] and the
> inspections performed on the lift after the accident, . . .

---

[5] The riser interlock system is meant to ensure that the riser cannot be telescoped out until it has first been "fully elevated" into the seventy-two to seventy-four degree working envelope, and, conversely, that the riser cannot be lowered from that working envelope until it has first been fully retracted.

[6] Reliable Roofing was originally a defendant but was dismissed out after a pretrial settlement and is not a party to this appeal.

[7] The operation of the boom lift that day was partially captured on surveillance video of the area, albeit with a

the subject lift's riser interlock system was out of adjustment. One of the riser fully elevated proximity sensors was out of adjustment to the point that it would not indicate that the riser was fully elevated. Also, the mechanical limit switch utilized to determine that the riser was fully retracted [i.e., the riser retracted limit switch] was out of adjustment to the point that it would not indicate if the riser was extended."

3. Summary of E4R's relevant acts and omissions. The jury could have found that the uncorrected adjustment issues caused the accident and resulted from the following interrelated problems with training, maintenance, and inspection by E4R: (1) E4R failed to properly train the person responsible for maintaining and inspecting the boom lift, including the riser interlock system; (2) E4R improperly installed a proximity sensor in the lift causing it to be out of adjustment; (3) E4R failed to discover the improper installation for nine months, even after many inspections; (4) E4R did not properly test the riser retracted limit switch; and (5) despite the dangers associated with operating the lift with a malfunctioning riser interlock system, E4R attached a tag to the lift that stated both "ready to rent" and "ready to use," and E4R's delivery driver told Johnson that the boom lift "was all set to go."

Discussion. 1. Standards for determining gross negligence. The jury awarded punitive damages against E4R

---

limited field of view. At the time of the accident that view included the base of the lift and the lower portion of the riser.

pursuant to G. L. c. 229, § 2,[8] after finding that "E4R's conduct [was] grossly negligent, wilful, wanton, or reckless." E4R does not contest its ordinary negligence,[9] but claims on appeal that there was insufficient evidence to support the jury's award of punitive damages. Because the plaintiff primarily relied on a theory of gross negligence in her closing argument at trial, we proceed to consider the sufficiency of the evidence under that theory of liability for punitive damages.[10]

---

[8] The Commonwealth's wrongful death statute, G. L. c. 229, § 2, as appearing in St. 1973, c. 699, § 1, provides in relevant part that

> "A person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted . . . shall be liable [for] . . . punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant . . . . Damages under this section shall be recovered in an action of tort by the executor or administrator of the deceased."

[9] Nor has E4R disputed that as a lessor of equipment it owed Williamson, as a foreseeable plaintiff, a duty of reasonable care in its acts and omissions concerning the equipment. See, e.g., Mitchell v. Lonergan, 285 Mass. 266, 268-270 (1934); Carter v. Yardley & Co. Ltd., 319 Mass. 92, 96 (1946); McLaughlin v. Bernstein, 356 Mass. 219, 225 (1969); Milham v. Paul Mitrano, Inc., 3 Mass. App. Ct. 73, 75-76 (1975); Restatement (Second) of Torts §§ 388, 391-393, 407-408 (1965). Contrast Kassis v. Lease & Rental Mgmt. Corp., 79 Mass. App. Ct. 784, 788-790 (2011).

[10] Plaintiff's counsel argued to the jury that E4R's failure to properly inspect the boom lift was gross negligence:

In <u>Aleo</u> v. <u>SLB Toys USA, Inc</u>., the Supreme Judicial Court
observed that

> "Gross negligence is substantially and appreciably higher
> in magnitude than ordinary negligence. . . .  It is very
> great negligence, or the absence of slight diligence, or
> the want of even scant care. . . .  Gross negligence is a
> manifestly smaller amount of watchfulness and
> circumspection than the circumstances require of a person
> of ordinary prudence."

466 Mass. 398, 410 (2013), quoting from <u>Altman</u> v. <u>Aronson</u>, 231
Mass. 588, 591-592 (1919).  See <u>Christopher</u>, 57 Mass. App. Ct.
at 230-231.  In making this determination, the finder of fact
must consider the "conduct [of the defendant] . . . as a whole."
<u>Duval</u> v. <u>Duval</u>, 307 Mass. 524, 528 (1940).  The fact finder "is
not required to pass separately upon the various elements that
enter into a defendant's [overall] conduct."  <u>Ibid</u>.  In
evaluating such conduct, however, "persistence in a palpably
negligent course of conduct over an appreciable period of time
[is one] of the more common <u>indicia</u> of gross negligence."  <u>Lynch</u>
v. <u>Springfield Safe Deposit & Trust Co</u>., 294 Mass. 170, 172
(1936).  See <u>Bruno</u> v. <u>Donahue</u>, 305 Mass. 30, 34 (1940).  All
that being said, "[t]he line between gross negligence and

> "Frankly ladies and gentlemen if a mistake had been made
> one time, maybe two times, maybe even three times, would
> that still be ordinary negligence?  Probably it would.  But
> somewhere between the third time and the [seventeenth] time
> the inspection for the lift . . . that negligence crossed
> the line into gross negligence."

ordinary negligence is often difficult to draw."  Belina v.
Pelczarski, 333 Mass. 730, 733 (1956).  In the instant case,
"[t]he judge's instructions to the jury [on gross negligence]
were consistent with these principles, and we accept the
conclusion of a properly instructed jury on a question within
their province."  Christopher, 57 Mass. App. Ct. at 231.  We
thus proceed to analyze collectively the multiple acts and
omissions of E4R from which the jury could have found it liable
for gross negligence.

2.  E4R's errors and omissions.  a.  Negligence in
training.  The jury could have found that the E4R employee
responsible for inspecting and maintaining the boom lift,
including the riser interlock system, Paul Delorey, was not
properly trained.  The jury would have been warranted in finding
that although Delorey had received some training in the
operation of the lift from another E4R employee, that training
was insufficient as to the repair and testing of the lift's
riser interlock system.  E4R also had never brought anyone in
from Grove to train Delorey, and he was "[n]ever offered the
opportunity to be trained at the Grove facilities."  Delorey
testified at trial that he was not "trained and qualified to
work on the riser interlock system of the [boom lift]."  Indeed,
as will be explained in more detail infra, he was not even aware
of the existence of the riser retracted limit switch at the time

he was responsible for inspecting and maintaining the lift. He further conceded "that there is grave danger to people in the workplace if equipment is rented out when it is not being maintained by trained and qualified mechanics."

E4R owed a duty to Williamson to ensure that Delorey had adequate training to maintain and inspect the lift. See Restatement (Second) of Torts § 307 comment a (1965); Restatement (Second) of Agency § 213(b) & comments d & e, § 214 & comment c (1958). The failure of E4R to properly train Delorey to maintain and inspect a dangerous instrumentality like a boom lift was one factor that the jury could have considered in reaching their verdict that E4R was grossly negligent. See Renaud v. New York, N.H. & H.R.R., 206 Mass. 557, 560 (1910) (breach of duty that will likely result in death or "very serious" harm may support a finding of gross negligence); Renaud v. New York, N.H. & H.R.R., 210 Mass. 553, 560 (1912) (same).

b. Negligence in maintenance: E4R improperly replaced a proximity sensor more than nine months before the accident. On April 17, 2008, two employees of E4R, Paul Delorey and William San Soucie, replaced one of the two "riser fully elevated" proximity sensors after discovering a problem with it.[11] This is

---

[11] The purpose of the two "riser fully elevated" proximity sensors is to detect whether the riser is elevated to its seventy-two degree working envelope. As Grove's expert explained, if these two sensors' readings are not in agreement

the same sensor that after the accident was found to be out of adjustment, both by an independent investigator reporting to the Occupational Safety and Health Administration and by one of Grove's experts. The jury would have been warranted in finding that Delorey's faulty installation of the proximity sensor in 2008 had caused it to be out of adjustment and that the sensor had not become out of adjustment during the delivery of the boom lift or as a result of the accident.[12]

---

on this point, the riser interlock system enters a "fault mode" that "prevents movement of the riser except movements that will allow an operator to safely retract the riser and lower the platform to the ground. . . . [W]hen in [fault mode], a mechanical limit switch [(the riser retracted limit switch)] is utilized to confirm that the riser is fully retracted prior to allowing the riser to be lowered." When the riser interlock system is in fault mode, it ignores readings from all four proximity sensors, even properly functioning ones -- including those from the second pair of sensors, which detect whether the riser is fully retracted. In fault mode the system relies instead on the limit switch for the latter purpose.

[12] The jury could have credited the plaintiff's expert's testimony, concluding that the replaced sensor "did not go out of adjustment by wear and tear" but rather had remained "out of alignment . . . [since] it was replaced in April of 2008." Likewise the jury could have credited the expert's testimony that he "[d]id [not] see any indication that the accident had caused it to be off." When he was asked at trial whether the short, four-mile trip that the boom lift took on a flatbed truck from the pre-rental inspection site in South Boston to the job site on West Street "could [have] shake[n] loose the sensor," he responded, "[i]t's virtually -- I -- I never like to use the word impossible but it's pretty close." He reported that when he observed the sensor after the accident it did not appear to be loose. He opined that, because the sensor was held in place by locknuts, if it "was installed properly it would not have changed [its position]."

Delorey testified at trial that when he "put [the proximity sensor] on the machine" he did so without first referencing either the manufacturer's "Operator's, Safety, and Maintenance Handbook" for the boom lift (the operator's manual) or the manufacturer's "Repair Manual" (the repair manual).  He also testified that he did "not remember . . . performing any measurements [after the proximity sensor was replaced] to be sure it was on exactly the same plane relative to the trip plate."

The jury would have been warranted in concluding that at the time of its delivery to Reliable Roofing, the boom lift was negligently and defectively repaired.  See Restatement (Second) of Torts § 408 comment a (1965) ("If the lessor repairs [the chattel], he is subject to liability if the repairs are not carefully made").  Given the likelihood that someone's death would result from E4R's failing to exercise reasonable care in repairing the proximity sensor, its failure to exercise such care, in combination with the absence of training discussed above, was evidence of "the absence of slight diligence, or the want of even scant care."  Aleo, 466 Mass. at 410, quoting from Altman, 231 Mass. at 591.  See Christopher, 57 Mass. App. Ct. at 230.  See also Renaud, 206 Mass. at 560.

c.  Negligent testing and inspection of the proximity sensors and the riser retracted limit switch.  As explained in

the operator's manual, the procedure to test the riser interlock system "must be followed exactly[, as the] failure to follow [the] outlined procedures may result in death or injury to personnel."  Indeed, Delorey, the person responsible for inspecting the boom lift, testified that "it is crazy not to properly inspect the [boom lift] before it goes out."  The jury could therefore have considered E4R's lack of reasonable care in testing and inspection as one factor contributing to a finding of gross negligence.  See Renaud, 206 Mass. at 560 (observing that a jury may find gross negligence where a defendant's failure to perform a legal duty is likely to have "a fatal or a very serious" result).  See also Mitchell v. Lonergan, 285 Mass. 266, 270 (1934) ("[T]he defendant[] [lessors] are liable to the plaintiff as the guest of the hirer of the automobile let by them . . . for injuries sustained by her by reason of the defective mechanism of the automobile, which might have been discovered by the defendants by the exercise of reasonable care in inspection before the letting"); McLaughlin v. Bernstein, 356 Mass. 219, 222, 225 (1969) ("The minuteness of the inspection required varies with the danger which will be likely to result if the chattel is defective . . ."), quoting from Restatement (Second) of Torts § 408 comment a; Ikeda v. Okada Trucking Co., 47 Haw. 588, 600 (1964) (lessor of a construction crane has a duty to "use reasonable care to see that [the crane] is

reasonably safe for use, even where there is not actual knowledge of the presence of a defect, or knowledge of facts which would indicate a defect exists"), quoting from La Rocca v. Farrington, 276 A.D. 126, 129 (N.Y. App. Div. 1949), aff'd, 301 N.Y. 247 (1950).

The plaintiff's expert testified that "proper testing of the lift before it was sent to a lift site would have revealed the problems in the riser interlock system." Nonetheless, between the sensor replacement in April of 2008 and the date of the accident, February 7, 2009, E4R rented the boom lift sixteen other times, performing pre-rental inspections each time, and the problem remained.[13] Although Delorey testified that he did not "have actual memories of" the pre-rental inspections subsequent to the sensor replacement, he testified that he "never detected a problem with the [proximity] sensor light."

Delorey also testified that "when [he] did [his] inspections and pre[-]rental inspections on this [boom lift], including up to the time of the inspection before the accident, [he] never did a test that was specifically designed to determine if the mechanical [riser retracted limit] switch was functioning." Delorey only discovered that the riser interlock

---

[13] See note 12, supra, and accompanying text (jury could conclude that Delorey's faulty replacement of the proximity sensor in 2008 had caused it to be out of adjustment during the 2009 accident).

system included such a limit switch during a deposition taken in the instant case. Prior to that, he was not "even aware that this particular riser interlock system used a riser retracted limit switch."

The boom lift's repair manual, however, details a test to perform to verify that the riser retracted limit switch is correctly indicating that the riser is fully retracted. Delorey testified that he never had access to the repair manual, claiming that he had asked E4R for a repair manual for the boom lift at some point, but E4R had told him that they did not have one. Delorey claimed that "all the time [he was at E4R] and all the time [he was] working on this lift, [he] never had a repair manual." The service manager of E4R testified that the company did, in fact, have a repair manual, but he was not "aware of" any time that Delorey had asked for one. Either way, the jury could have found that the person responsible for inspecting the riser retracted limit switch never consulted the repair manual that provided instructions on how to do the test. This was evidence of "the want of even scant care." Aleo, 466 Mass. at 410, quoting from Altman, 231 Mass. at 591. See Christopher, 57 Mass. App. Ct. at 230.

Although he never referenced the repair manual, Delorey did testify that he "referred to the operator's manual . . . [i]f [he] had a question on anything," but he acknowledged at trial

that he had never read the operator's manual "[w]ord for word." He agreed that, if he "had ever taken the trouble to read in the [operator's] manual, [he] would have learned about the role of the riser retracted limit switch." The jury would have been warranted in finding that the operator's manual alone should have put Delorey on notice of the dangers of an improperly maintained riser interlock system.

Although Delorey was not aware of the existence of the riser retracted limit switch or how to test it, he testified that, during inspections, he typically performed a "function test" to see whether the riser could be extended (i.e., telescoped out) before it was in the fully elevated position and whether, once the riser was in the fully elevated and extended position, it could be lowered.[14] The jury were, however, warranted in finding that Delorey had failed to properly conduct the tests he claimed to have done, because otherwise those tests would have revealed the problem with the limit switch. See McLaughlin, 356 Mass. at 225 (liability found where a lessor "failed to make any inspection of [a critical component of a

_____

[14] Elsewhere, Delorey testified that he "[n]ever d[id] any test that put the [boom lift] into fault [mode] and tried to lower the riser when it was telescoped." See note 11, supra.

dangerous chattel it had leased], a simple task which could be easily accomplished").[15]

d. E4R's repeated failure to discover the problem with the proximity sensor was an indicator of gross negligence. One indicator of gross negligence is that E4R "persiste[d] in a palpably negligent course of conduct over an appreciable period of time." Lynch, 294 Mass. at 172. Dombrowski v. Gedman, 299 Mass. 87, 88-89 (1937). Although "[e]ach [gross negligence] case must be decided upon its own peculiar facts," Romer v. Kaplan, 315 Mass. 736, 738 (1944), citing Quinlivan v. Taylor, 298 Mass. 138, 140 (1937), we observe that, in cases where a jury finds that heightened danger would likely result from a tortfeasor's continued negligence and that the tortfeasor reasonably should have apprehended such danger, relatively less

_____

[15] The jury would have been warranted in concluding that a fully functioning riser interlock system normally prevents the operator from lowering the riser from full elevation while it is extended. While Delorey was ignorant of the critical role that the riser retracted limit switch played in keeping the boom lift safe when a proximity sensor was out of adjustment (see note 11, supra), there was sufficient evidence for the jury to find that he knew that if the riser could be lowered while it was extended, it was a sure sign that the lift was in a dangerous condition. The evidence was sufficient for the jury to infer that the proximity sensor and the riser retracted limit switch were both out of adjustment at the time of E4R's final pre-rental inspection, and therefore the function test Delorey claimed to have performed would have revealed that the riser could be lowered while it was extended. The jury therefore could have concluded that Delorey either did not do the function test that he claimed he performed or that he was so inattentive as to ignore what the critical function test indicated.

time must pass for a finding of gross negligence than would be required absent such reasonable apprehension. See Granger v. Lovely, 302 Mass. 504, 507 (1939). Cf. Nauss v. Boston & Me. R.R., 195 Mass. 364, 369 (1907) (acts or omissions may be evidence that warrants a finding of gross negligence if circumstances are such that they would "lead to reasonable apprehension that [the tortfeasor's negligence in those circumstances] would lead to death or serious injury"); Renaud, 206 Mass. at 560 ("When the injury likely to ensue from failure to do that which ought to be done is a fatal or a very serious one, what otherwise would be a lack of ordinary care may be found to be gross negligence").

In light of these considerations, the jury would have been warranted in concluding that E4R's failure to discover their dangerous error after nine months and seventeen pre-rental inspections displayed "persistence in a palpably negligent course of conduct over an appreciable period of time." See Lynch, 294 Mass. at 172. The jury thus could have considered this as an indicator of gross negligence. See ibid. See also McGaffigan v. Kennedy, 302 Mass. 12, 14-15 (1938).

e. "[R]eady to rent" and "ready to use" tag. Further compounding its negligence, E4R delivered a poorly inspected, dangerously defective boom lift with a single tag attached to it

claiming that the lift was "ready to rent" and "ready to use."[16]
See McLaughlin, 356 Mass. at 220 (negligence found when
defective wallpaper removal machine leased without proper
inspection and lessor's manager stated that "it's already [sic]
for you"); Schaeffer v. General Motors Corp., 372 Mass. 171,
173-177 (1977) (defendant automobile manufacturer could be found
to have violated duty to warn, where owner's manual represented
vehicle component in question as safety device but did not warn
of attendant risks, of which jury could have found defendant
aware).  The E4R driver who delivered the boom lift on the day
of the accident also told Johnson that the lift "was all set to
go."  Johnson testified that the tag led him to conclude that
"everything was in working condition . . . [and that E4R] had
tested [the lift] out and it was ready to go."  E4R's delivery
driver testified at trial that it was his understanding "that
after [he] dropped off [the boom lift] that the customer could

---

[16] The jury were instructed as follows:

"A supplier of a product like [E4R] has a duty to the
foreseeable user to exercise reasonable care to inform the
user or operator of the [boom] lift of any dangerous
condition or of facts which make it likely to be dangerous
if the supplier knows or has reason to know that the
product is or is likely to be dangerous in its foreseeable
use and has reason to believe that the foreseeable user
won't recognize the product's dangerous condition."

See Restatement (Second) of Torts §§ 388, 407, 408 (1965).  See
also McLaughlin, 356 Mass. at 225; Schaeffer v. General Motors
Corp., 372 Mass. 171, 174 (1977).

simply start operating the machine without performing an inspection on it."  E4R's general manager testified that "the green ['ready to rent'] tag is to tell the customer that the lift is ready to use . . . [and that] the safety and performance of this equipment has been verified" by E4R.  E4R's service manager testified to much the same thing and further acknowledged that the tag also says "ready to use" in addition to "ready to rent."

There was also sufficient evidence to support a finding that, during E4R's final pre-rental inspection of the boom lift, Delorey "ha[d] reason to know that the [lift was] or [was] likely to be dangerous for the use for which it [was] supplied."[17]  Restatement (Second) of Torts § 388(a) (1965).  See

---

[17] The jury could have concluded that the indicator lights on the boom lift should have been sufficient warning to Delorey that there was a problem with a proximity sensor.  Because we have concluded (see note 12, supra, and accompanying text) that the jury would have been warranted in finding that one of the two riser fully elevated proximity sensors was out of adjustment at the time of E4R's last inspection, merely raising the riser to full elevation, as Delorey said he typically did during inspections, would have caused the lift's indicator lights to signal that there was a problem with a proximity sensor.  Red and green lights would have been flashing on the upper control panel, where Delorey said he was stationed during the final pre-rental inspection.  There also was sufficient evidence for the jury to infer that upon full elevation of the riser, additional indicator lights that were integrated into a device on the boom lift's base should have indicated the problem to San Soucie, Delorey's coworker who assisted from the ground with the final pre-rental inspection.  There was sufficient evidence from Delorey's testimony to support a finding that, although he was not trained in adjusting the riser interlock system, he did

id. §§ 407, 408. Furthermore, after attaching the "ready to rent"/"ready to use" tag to the boom lift, E4R would have "no reason to believe that those for whose use the chattel [was] supplied [would] realize its dangerous condition." Id. § 388(b). See id. § 408. As the jury were warranted in finding that the riser interlock system had not been properly tested and was not working, and that E4R had reason to know that the boom lift was therefore highly dangerous to operate, the inclusion of the tag saying that the lift was ready to use safely was further evidence of gross negligence on the part of E4R. See Aleo, 466 Mass. at 410-411; Christopher, 57 Mass. App. Ct. at 230-231.

3. Conclusion. The jury would have been warranted in concluding that E4R's combined failures in training, maintenance, and inspection, along with its misinforming the operator that the dangerously defective boom lift was ready to rent and use, demonstrated "a manifestly smaller amount of watchfulness and circumspection than the circumstances require[d] of a person of ordinary prudence." Aleo, 466 Mass. at 410, quoting from Altman, 231 Mass. at 592. See Christopher, 57 Mass. App. Ct. at 231. Additionally, at least with regard to

_____

understand how to recognize when there was a problem with a proximity sensor by observing the indicator lights on the lift. There was also sufficient evidence, based on Delorey's testimony about his 2008 repair attempt on the boom lift, to support a finding that he knew that he should take the lift out of service if there was a problem with a proximity sensor.

the failure to discover the problem with the proximity sensor, the jury could have found that E4R had "persiste[d] in a palpably negligent course of conduct over an appreciable period of time." Lynch, 294 Mass. at 172. See Bruno, 305 Mass. at 34. The accumulation of all of the foregoing evidence was sufficient to support the jury's finding of gross negligence and the punitive damages stemming therefrom. See Duval, 307 Mass. at 528 (defendant's "conduct is to be considered as a whole" to determine whether it was grossly negligent).

Judgment affirmed.

<u>Appendix</u>.



Diagram of boom lift (from trial exhibit 28, modified to omit labels from parts not discussed in opinion)



Photograph of boom lift (from trial exhibit 26, manufacturer's brochure)



Illustration of boom lift's "working envelope" (from trial exhibit 26, manufacturer's brochure)